**In the Matter of VIETRI HOMES, INC., and Albert A. Vietri, Inc., Debtors.**

**Bankruptcy No. 79–238.**

United States Bankruptcy Court, D. Delaware.

Jan. 16, 1986.

Frank J. Miller, Wilmington, Del., for First Federal Sav. and Loan Ass'n.

Richard R. Cooch, Wilmington, Del., for William M. Young Co., Brosius-Eliason Co. and C.K.M. Supply Co.

Thomas D. Runnels, Newark, Del., trustee.

### MEMORANDUM OPINION AND ORDER

HELEN S. BALICK, Bankruptcy Judge.

Albert A. Vietri was a home builder who controlled two corporations, Vietri Homes, Inc. and Albert A. Vietri, Inc. Each case was filed under Chapter 11. There was a subsequent substantive consolidation followed by a conversion to Chapter 7. The corporations were building homes on property known as Anvil Park. First Federal Savings and Loan Association was the construction lender. Brosius-Eliason Company, C.K.M. Supply Company, and William M. Young Company supplied lumber and other building materials to the construction site.

*Facts*

Brosius-Eliason Company, C.K.M. Supply Company, and William M. Young Company on August 12, 1981 filed a motion seeking subordination of the claim of First Federal Savings and Loan Association. Hearings on the motion were held September 28 and November 24, 1981. Movants' claims are:

| | |
|---|---|
| Brosius-Eliason | $22,545.13 |
| C.K.M. Supply Co. | $40,770.61 |
| Young Company | $31,251.29 |

First Federal holds a first mortgage on debtors' real property. Movants hold mortgages junior to that of First Federal. When debtor's property was sold at public auction in October 1981, First Federal was the successful bidder. At that time it paid the sum of $94,577.03 to the Trustee to be escrowed pending resolution of these three claims. On August 31, 1982, First Federal and Young Company agreed to a settlement whereby First Federal's position was subordinated to that of Young Company to the extent of $14,000 and this amount was disbursed. The claims of Brosius-Eliason and C.K.M. remain unsettled. Since each claimant has a different factual basis in support of its claim for subordination, each must be dealt with separately.

*Facts relating to the claim of C.K.M. Supply Company*

C.K.M. supplied materials to the Anvil Park construction site from April 14, 1976 to September 19, 1977. (T2 6). Deliveries were stopped after September 19, 1977 because the Vietri account was in arrears for a total of $40,770.61. C.K.M. bases its claim for equitable subordination on the following transactions:

1. A statement by George Allen, First Federal's construction loan officer, to the effect that if C.K.M. filed mechanic's liens, others would follow, and the Bank would be forced to foreclose on the property and C.K.M. would receive no payment on its past due accounts. (T2 23).

2. An oral promise from George Allen that C.K.M. would be paid $1,000 from subsequent settlements in satisfaction of their past due accounts. (T2 23).

C.K.M. argues that these statements caused C.K.M. to forego its mechanic's lien rights to C.K.M.'s detriment.

In regard to George Allen's statement regarding possible foreclosure if mechanic's liens were filed, C.K.M.'s only witness,

Mr. Kenneth Taylor, President of C.K.M., testified that he already knew from past experience that foreclosure sometimes followed the filing of mechanic's liens (T2 24) and that his company did not always file mechanic's liens when accounts were past due. (T2 23). Moreover, Taylor admitted that Mr. Allen did not tell him not to file mechanic's liens. (T2 24).

The oral promise of $1,000 per settlement is without written documentation. Mr. Taylor is unclear as to when the promise was made to him but testified that it was made via telephone no later than two months after the last delivery of materials on September 19, 1977. (T2 23). Mr. Taylor testified that he was certain that the promise was made within the statutory lien period. In rebuttal, George Allen testified that he did not make such a promise, that he had no recollection of any telephone conversation with Mr. Taylor, and that the first time he met Mr. Taylor was at the creditors' meeting. He further stated that he would not have taken the authority on himself to make such a statement at that time. (T2 50).

C.K.M.'s lien position is second to First Federal by virtue of a mortgage given by Vietri Homes, Inc., in January 1979 in the amount of $40,770.61.

*Facts relating to the claim of Brosius-Eliason*

On July 6, 1978, Brosius-Eliason obtained a mortgage from Vietri for $40,000.00 as security for past due accounts totalling $35,756.72. Payments of $2,500 from each subsequent settlement were received and applied to the mortgage and by June 1979 the mortgage was paid in full. (T1 108). Their present claim of $22,545.13 is for deliveries made after July 11, 1978.

First Federal was the construction lender in the Anvil Park project and had been making disbursements directly to Albert Vietri who then paid suppliers and subcontractors from these funds. In July 1978, it was determined that Vietri was not paying suppliers and subcontractors and so, with the consent of Albert Vietri, the Bank set up a vouchering payment system for fu-

ture work. Under the Bank vouchering system, instead of disbursing construction loan monies directly to the general contractor, the Bank was to disburse the funds directly to the suppliers and subcontractors upon Vietri's approval of their invoices. The purpose of the voucher system was to assure suppliers and subcontractors payment so as to keep the Anvil Park project going. The record contains testimony of Mr. Charles Shoemaker, Vice President of Brosius-Eliason, that those in the construction industry view bank vouchering as a clear guarantee of payment. (T1 102–3).

On July 11, 1978, George Allen sent a letter to Brosius-Eliason informing them of the Bank vouchering payment system for future deliveries. Brosius-Eliason argues that in reliance on the Bank vouchering payment system, it continued making deliveries of building supplies to Vietri's Anvil Park site for more than one year and that $22,545.13 remains unpaid on the Vietri account.

First Federal contends that all Brosius-Eliason invoices submitted by Vietri to the Bank for payment were indeed paid. (T2 68). To this account, $6,000 was paid by First Federal on January 15, 1979.

Brosius' lien position is third to First Federal by virtue of a mortgage for $22,-545.13 obtained on June 27, 1979.

*Applicable Law*

The motion seeking subordination of First Federal's first lien on real estate to the claims of Brosius-Eliason and C.K.M. Supply Company is made pursuant to 11 U.S.C. § 510(c) which reads in pertinent part:

... after notice and a hearing, the court may (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim...

Its purpose is to give the court the power to undo or to offset any inequity in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of estate distributions. *W.T. Grant*, 4 B.R. 53 (Bkrtcy.S.D.N.Y.1980).

Section 510(c) does not, however, specify the criteria to be used by the courts in subordinating claims but directs that the courts are to be governed by the principles of equitable subordination which have been developed by case law. *Collier on Bankruptcy*, 15th Ed. Volume 3, pp. 509–12; 510–8.

In *In the matter of Mobil Steel Co.*, 563 F.2d 692, 699–700 (5th Cir.1977), the court proposed three conditions which must be satisfied before the power of equitable subordination is appropriate:

(i) The claimant must have engaged in some type of inequitable conduct.

(ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

Although the remedy of equitable subordination is most often invoked in fiduciary situations, relief may be accorded in non-fiduciary situations. The primary distinction between subordinating claims of fiduciaries versus non-fiduciaries lies in the severity of misconduct required to be shown. *In re Ludwig Honold Manufacturing Co.*, 46 B.R. 125 (Bkrtcy.E.D.Penn.1982). Where a claimant is a fiduciary, courts generally require a showing of fraud, overreaching, inequitable conduct or the violation of the rules of fair play and good conscience. Where the claimant is a non-fiduciary, a more egregious standard of misconduct must be met. *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *In re Ludwig Honold Manufacturing Co.*, supra.

Generally, a creditor who is not an insider is under no fiduciary obligation to its debtor or to other creditors of the debtor in the collection of its claim. Parties may assuredly deal at arm's length for their material benefit without raising a confidential relationship between them. *Id.* This general rule, however, is not without exception. A fiduciary relationship need

not arise from any particular legal relationship but will necessarily spring from an attitude of trust and confidence based on some form of agreement, express or implied, from which it can be said that minds have met to create a mutual obligation. Such a confidential relationship is never presumed and the burden of proof is upon the party asserting it. *Rader v. Boyd*, 252 F.2d 585 (10th Cir.1957).

*Application of the law to C.K.M.'s claim*

■ The formula set forth in the *Mobil Steel Co.* case for granting equitable subordination requires a determination that First Federal engaged in some type of inequitable conduct. C.K.M. contends that Mr. Allen's statement that bank foreclosure could follow the filing of mechanic's liens and his promise to pay C.K.M. $1,000 from each subsequent settlement amounts to inequitable conduct because C.K.M. in reliance forewent its mechanic's lien rights resulting in its being relegated to a second lien position on debtors' property.

C.K.M. presented no evidence of coercion, persuasion or justifiable reliance on Mr. Allen's statements. C.K.M.'s president stated his company did not always file mechanic's liens on past-due accounts, he knew from personal experience that foreclosures often followed the filing of mechanic's liens, and Mr. Allen did not ask C.K.M. not to file mechanic's liens. As to the promise to pay C.K.M. $1,000 per settlement, Mr. Taylor, C.K.M.'s president, provided no written documentation of the promise nor was his testimony clear as to when it was given. He testified only that the promise was given via telephone within the lien period, no later than two months after final delivery of materials on September 19, 1977. In rebuttal, George Allen stated that he never made the promise; he had no recollection of ever speaking to Mr. Taylor on the telephone; his first acquaintance with Mr. Taylor was at the creditors' meeting; and he would not have assumed authority to make such a promise at the time in question.

During that time, the Fall of 1977, First Federal was disbursing construction monies directly to Mr. Vietri. There was no evidence that First Federal was in any way involved in the direct payment of Vietri's creditors. Therefore, the inference to be drawn is that George Allen would not take upon himself authority to commit $1,000 per settlement to payment of C.K.M.'s past due accounts.

C.K.M.'s decision not to file mechanic's liens was based on its own experience and business judgment—not on inequitable conduct of First Federal.

*Application of the law to Brosius-Eliason's claim*

■ Brosius-Eliason contends it continued to make deliveries of building supplies and forewent its lien rights because of First Federal's letter informing it of the vouchering payment system. Mr. Shoemaker's statement that in the industry such a system is viewed as a guarantee of payment was not disputed. This contention requires a determination of the standard by which First Federal's action should be measured.

First Federal established the vouchering payment system because of Vietri's poor financial condition. It assumed responsibility for direct payment to suppliers and subcontractors on various construction projects upon Vietri's submission of invoices so that suppliers and subcontractors would continue doing business with Vietri and keep the Anvil Park project going. First Federal's action was taken to protect its position by creating an attitude of trust and confidence in the minds of suppliers and subcontractors. Thus a fiduciary relationship was created.

Under the vouchering system, Brosius-Eliason was to submit invoices to Vietri. Vietri was to approve and forward the invoices to First Federal for payment. First Federal paid all Brosius-Eliason invoices submitted by Vietri and had no knowledge of any past-due amount owing to Brosius-Eliason. Brosius-Eliason did not contact First Federal about any unpaid invoices during the more than one year during

which materials were supplied to the Vietri job sites nor did First Federal refuse to pay any of the Brosius-Eliason invoices submitted to it during the period.

Brosius-Eliason was aware of Vietri's shaky financial condition. In July of 1978, Vietri gave it a mortgage to secure past due accounts of $35,756.72. First Federal's July 11, 1978 letter informing of the vouchering system gave it a signal that Vietri was not handling the payment of his accounts properly. Brosius-Eliason understood that invoices were being approved and forwarded by Albert Vietri to First Federal for payment. Yet, Brosius-Eliason never contacted First Federal regarding past-due invoices in a period of more than one year. The inference to be drawn is that the invoices representing Brosius-Eliason's claim were not paid because Vietri never submitted them to First Federal and Brosius-Eliason never made the outstanding invoices known to First Federal. Consequently, Brosius-Eliason has not shown any conduct on the part of First Federal that warrants subordination of First Federal's claim to that of Brosius-Eliason's claim.