**In re RANCHO CHAMBERINO, INC., Debtor.**

**Bankruptcy No. 87–30228.**

United States Bankruptcy Court, W.D. Texas, El Paso Division.

July 15, 1987.

---

Bud Kirk, El Paso, Tex., for B.F.W. Enterprises, Inc.

Phyllis Bracher, El Paso, Tex., Chapter 12 Trustee.

Don Studdard, El Paso, Tex., for debtor.

## MEMORANDUM OPINION

LARRY E. KELLY, Bankruptcy Judge.

This Chapter 12 case involves the difficult issue of whether a contract for deed, in which the Debtor is vendee, should be deemed an executory contract under Section 365 or a mortgage which can be dealt within a plan of reorganization. This issue is raised by Movant's Motion to Dismiss Chapter 12 Proceedings, or in the Alternative, for an Order Declaring that Executory Contract was not Lawfully Assumed and is not Property of the Estate, or in the Alternative, for Order Requiring Debtor to Cure all Arrearages on Executory Contract.

## ISSUES PRESENTED

In its Motion, Movant B.F.W. Enterprises, Inc. ("B.F.W."), raises the following issues:

1. Whether Rancho Chamberino, Inc. qualifies as a family farmer under Chapter 12 of the Bankruptcy Code;

2. Whether the farm and ranch proper-. ties referred to in the Purchase and Sales Contracts ("contracts") are property of this Debtor's estate; and

3. Whether the contracts are executory contracts which must be assumed or rejected pursuant to Section 365. The Debtor urges this Court to find an overriding federal interest in Chapter 12 cases involving contracts for deed and based upon such overriding federal interest, deem such contracts to be mortgages.

## FINDINGS OF FACTS

1. In February 1982, B. Edward Schmidt, Jr. and wife, Marjorie T. Schmidt, of El Paso, Texas, contracted to purchase

approximately 200 acres of farmland in Chamberino, New Mexico. Although Mr. and Mrs. Schmidt were divorced prior to the filing of these Chapter 12 proceedings, they will hereinafter be collectively referred to as "Schmidt."

2. Simultaneously with the execution of the Schmidt contract, C.W. Downs and wife, Nancy S. Downs, of Albuquerque, New Mexico, business associates of Schmidt, contracted to purchase approximately 600 acres of "uplands" or ranch land, adjoining the Schmidts' farmland tract.

3. In both instances, the seller was B.F. Whitaker who had previously owned and farmed these two tracts.

4. Both purchase agreements were in writing and were denominated as "Purchase and Sales Contracts" ("contracts"). The essential terms included a purchase price of $688,500 for the "Schmidt" farmland and $436,500 for the "Downs" ranch tract. At the closing of the contracts, down payments in the aggregate amount of $360,000, consisting of cash in the amount of $150,000 and real estate and improvements in the amount of $210,000, were tendered by the vendees to Mr. Whitaker. In accordance with other terms of the contracts, Mr. Whitaker executed warranty deeds in favor of the vendees and placed them in escrow. Mr. Whitaker himself served as escrow agent for this purpose.

5. In or about March 1983, Mr. Whitaker assigned all of its interest in these two contracts to a Texas corporation known as B.F.W. Enterprises, Inc., which is the Movant in these proceedings. Mr. Whitaker testified that he was the president and sole shareholder of B.F.W. Enterprises, Inc.

6. From January 1982 until mid-December 1985, the farm and ranch tracts were operated jointly under the supervision of Mr. Schmidt. Also during this time the vendees made three annual payments totalling approximately $340,000 to the vendor, Mr. Whitaker or his assignee, B.F.W.

7. On December 23, 1985 the individual vendees assigned their interests in the contracts to a newly formed Texas corporation, Rancho Chamberino, Inc. Both contracts contained provisions prohibiting assignment which state:

> "This contract shall inure to and be binding upon the heirs .. of the parties hereto, except same may not be transferred, sold or assigned by the Buyers without the written consent of the Seller first had and obtained. *Provided, however,* that the Seller will not unreasonably withhold his consent to such an assignment or sale provided that the assignee is a financially responsible individual or company with sufficient assets to assume and pay the balance due under this contract and to perform all of the obligations imposed upon the Buyers in this contract." (emphasis added).

Both contracts further provided that in the event of an assignment the original buyers would "nevertheless remain personally liable in all respects for the payment of the monies due hereunder and the performance of all of the obligations imposed upon the buyers in this contract."

8. The two individual vendees established the newly formed Rancho Chamberino, Inc. and hold all of the stock in the company and operate as its officers and directors. The sole assets of Rancho Chamberino, Inc. are the two tracts of land which are the subject of these two contracts, along with some equipment and crops. As a matter of fact, the financial worth of the acquiring entity Rancho Camberino, Inc., including the continuing personal liability of the original individual vendees, is not less than that which the vendor could look at prior to this assignment. The evidence further showed that the Debtor is a Texas corporation, 51% of Debtor's outstanding stock is owned by Mr. Schmidt as president and 49% by the Downs. Mr. Schmidt's ex-wife owns no interest in the Debtor entity. The evidence also clearly established that more than 80% of the value of the Debtor's assets consisted of assets relating to the farming and ranching operations, that Debtor's aggregate debt did not exceed $1,500,000, and that not less than 80% of its aggregate,

**558**

non-contingent debts arose from the farming operations and that Debtor's stock is not publicly traded.

9. Although the testimony on the consent to assignment issue was disputed, based upon the credible evidence before it, the Court finds that the assignment by Schmidt and Downs to Rancho Chamberino, Inc. was consented to by Mr. Whitaker or B.F.W. Further, the Court notes that if consent had been withheld, it would have been withheld unreasonably under the facts of this case.

10. In April 1986, Rancho Chamberino, Inc. tendered to B.F.W. the yearly payments due under the contracts for 1985. The December 1986 annual payment, however, was not made and faced with foreclosure proceedings in New Mexico, Rancho Chamberino, Inc. filed a petition for relief under Chapter 12 of the Bankruptcy Code on March 23, 1987.

11. At the May 20, 1987 hearing on Movant's Motion, both Mr. Whitaker and Mr. Schmidt testified that the reasonable rental value for the farm and ranch tracts is $21,200.00 per year. Also, Mr. Schmidt's testimony established that a number of very valuable crops had been planted and were in the process of being harvested, with the harvesting procedure to continue through mid-December 1987.

12. Evidence was also elicited which indicated that Mr. Whitaker or B.F.W. had no further action to take under the terms of the contracts other than to collect contract payments until the full balance of principal and interest is paid. Upon full and final payment, the deeds in escrow are to be turned over to the Debtor.

## DISCUSSION

13. The standing of Rancho Chamberino, Inc. to file Chapter 12 is resolved in favor of the Debtor. The only real fact issue which Movant relied on was that Mr. Schmidt, having been divorced prior to the filing of the bankruptcy, was not a "family" and that a *corporate* "family farmer" had to have a majority of its stock owned by a "family" and not an individual. This position is supported by the express language of Bankruptcy Code § 101(17) which defines "family farmer" and specifically subparagraph (B) which in defining a corporate "family farmer" states in pertinent part as follows:

"corporation or partnership in which more than 50% of the outstanding stock or equity is held by one *family,* or by one *family* and the relatives of the members of such *family* and such *family* or such relatives conduct the farming operation...." (emphasis provided).

Although Code § 101(17)(A) indicates that "individuals" may be family farmers, subparagraph (B) does not specifically include "individuals" as being a "family." Movant's objection, however, was withdrawn prior to the conclusion of the hearing when this Court observed that numerous drafting omissions appeared to have been made by Congress in its haste to enact Chapter 12 and that it seemed to the Court that the term "family" in Code § 101(17)(B) was such an omission. Because this objection was withdrawn and because all other elements of Code § 109(f) appear to be present, Rancho Chamberino, Inc. is deemed to be an eligible Debtor in Chapter 12.

14. Movant's second objection is premised on a conclusion that the "assignment" by the individual vendees to Rancho Chamberino, Inc. was "void" because of the anti-assignment language in the two contracts. This Court, however, has found that the assignments were consented to and that if they were not consented to, withholding of consent would have been unreasonable. Because of this finding the individual vendee's interest is now property of the Debtor's estate. Code § 541(a)(1).

15. The principal issue relates to how the two contracts are to be viewed. Movant urges this Court to follow the prior opinion of *In re Waldron,* 65 B.R. 169 (Bankr.N.D.Tex.1986) (land sale contract is "executory contract," and thus, land sale contract entered into by Debtors was executory contract which Debtors were required to assume or reject, and was not mortgage which could be dealt with in plan

of reorganization.); also *Shaw v. Dawson,* 48 B.R. 857 (D.C.New Mex.1985) (bankruptcy court was correct in ruling that the real estate contract at issue is an executory contract subject to the provisions of 11 U.S.C. § 365).

16. Debtor urges the Court, however, to follow the rationale of *In re Booth,* 19 B.R. 53 (Bankr.Utah 1982) which argues that a land sale contract in which the vendee is the debtor should not be considered an executory contract under 11 U.S.C. § 365. In that opinion the bankruptcy court set forth three reasons for its position: (1) enlarging the value of the estate; (2) furthering the rehabilitation of the Debtor; and (3) ability to provide adequate protection of creditors. The *Booth* rationale has been followed by a number of courts, including Judge Randolph Wheless of the Southern District of Texas. See, *In re Flores,* 32 B.R. 455 (Bankr.S.D.Tex.1983).

17. The fundamental problem, of course, is that the term "executory contract" is not defined in any section of the Bankruptcy Code. The legislative history of Section 365 indicates however, that Congress intended the term to be defined as a contract "on which performance remains due to some extent on both sides." S.Rep. 989, 95th Cong., 2d Sess. 58, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5844; H.R.Rep. No. 595, 95th Cong., 2d Sess. 347, *reprinted at* 1978 U.S.Code Cong. & Ad.News 5787, 5963, and 6303. This definition essentially follows the definition of an executory contract formulated by Professor Countryman in his seminal article on the topic. Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn.L.Rev. 439 (1973). According to Countryman, an executory contact for purposes of the bankruptcy statutes is:

"a contract under which the obligations of both the bankrupt and the other party are so far unperformed that failure of either to complete performance would constitute a material breach excusing the performance of the other." *Id.* at 460.

18. The district court in *Shaw v. Dawson* found that a New Mexico real estate contract appears to fall squarely within the Countryman definition of an executory contract and within the definition contemplated by Congress. The district court stated that:

"the obligation of the buyer to pay the purchase price according to the terms of the contract, and the obligation of the seller to deliver title to the buyer when full payment has been made, are both unperformed. Failure of either party to complete performance would constitute a material breach of the contract."

*Shaw v. Dawson,* 48 B.R. at 860. The same conclusion was reached by the Bankruptcy Judge in *In re Waldron* 65 B.R. at 175.

19. Movant, however, argues that the issue in this case must be determined on the basis of federal and not state law. The relationship between state property laws and the equity power of the bankruptcy court has been determined by the U.S. Supreme Court in *Butner v. U.S.,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). The Supreme Court notes that in most instances, bankruptcy courts should follow state property state laws, regardless of countervailing equities. It noted:

"Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. *Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving a windfall merely by reason of the happenstance of bankruptcy,"* (emphasis added)

citing *Lewis v. Manufacturers National Bank,* 364 U.S. 603, 609, 81 S.Ct. 347, 350, 5 L.Ed.2d 323 (1961).

20. Movant, however, urges the Court to pay particular attention to the Constitutional authority of Congress to establish "uniform laws on the subject of Bankruptcies throughout the United States" as noted by the Supreme Court in *Butner* and find that such authority would encompass a

federal statute which could define a party's interest in property in the bankruptcy estate. The issue in the *Butner* case involved a mortgagee's interest in rents and profits earned by property in a bankruptcy estate. In that case, the Supreme Court observed that Congress had chosen not to exercise its power to fashion any specific rule and had generally left the determination of property rights in the assets of a bankruptcy's estate to state law. Movant urges this Court to find that the enactment of the Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub.L. 99-554 is an exercise by Congress of its power which should encourage this Court to find an overriding federal interest in the issue at hand and further lead this Court to conclude that where the debtor is a vendee under a contract for deed, that such contract should be determined to be a mortgage and not an executory contract.

21. In reviewing the specific provisions of Chapter 12, however, it is clear that Congress did not express this "intent" in any readily discernible form. For example, the term "executory contract" still remains undefined. Further, Section 1205 relating to adequate protection in subparagraph (b) defines adequate protection when such is required under Section 362, 363, or 364 and does not mention Section 365. Further, it appears that the contents of any plan submitted by a family farmer are subject to Section 365 of the Bankruptcy Code. See Code § 1222(b)(6). In reviewing the scant legislative history available, this Court found no specific demonstration of concern on this issue despite the numerous court decisions going both ways on this issue. *See, generally*, 132 Cong.Rec. H 8986–9002 (daily ed. Oct. 2, 1986); and 132 Cong.Rec. S 15074–15094 (daily ed. Oct. 3, 1986).

22. Movant has also argued to the Court in pleadings and oral argument that holdings of various courts finding contracts for deed to be executory contract are the "minority view" and that such holdings must give way before the supposedly far more numerous and allegedly better reasoned decisions which, purportedly under equitable analysis originating within the Bankruptcy Code in various bankruptcy courts, have held that a contract for deed is a security device. However, the overwhelming percentage of those courts which have held contracts for sale to be security devices appear to rest at least in substantial part upon applicable state law already deeming such contracts for sale to be security devices. *See, e.g., In re Adolphsen*, 38 B.R. 776 (Bankr.D.Minn.1983) (following *Tysk v. Griggs*, 253 Minn. 86, 91 N.W.2d 127 (1958)); *In re Cox*, 28 B.R. 588 (Bankr. D.Idaho 1983) (following *Thomas v. Klein*, 99 Idaho 105, 577 P.2d 1153 (1978)); *In the matter of Patch Graphics*, 32 B.R. 373 (Bankr.W.D.Wisc.1983) (following *Kallenbach v. Lake Publications, Inc.*, 30 Wis.2d. 647, 142 N.W.2d 212 (1966)); *In re Gladding Corp.*, 22 B.R. 632 (Bankr.D.Mass. 1982) (following Massachusetts law); *In re Jones*, 54 B.R. 697 (Bankr.E.D.Ark.1985) (following *Judd v. Rieff*, 174 Ark. 362, 295 S.W. 370 (1927)); *In re Britton*, 43 B.R. 605 (Bankr.E.D.Mich.1984) (following Michigan decisions that contract vendor retains a mere lien); *In re Carr*, 52 B.R. 250, 13 C.B.C.2d 640, 643 (Bankr.E.D.Mich.1985) (following *Barker v. Klingler*, 302 Mich. 282, 4 N.W.2d 596 (1942)); *In re Bertelsen*, 65 B.R. 654, n. 2 at 657 (Bankr.C.D.Ill.1986) (following *Schay v. Penrose*, 25 Ill.2d 447, 185 N.E.2d 218 (1962) for the holding that "an Illinois land contract is in the nature of a secured transaction"); *In re Fahnders*, 66 B.R. 94 at 96 n. 2 (Bankr.C.D.Ill.1986) (following *Bertlesen*); however, *see In re Rehbein v. Dye*, 60 B.R. 436, 441 (9th Cir.B. A.P.1986) (holding that contract for deed was not "executory"). However, this decision seems to conflict with the Ninth Circuit's ruling in *In re Alexander*, 670 F.2d 885 (1982), that a contract for deed remains executory until escrow closes.

23. Other courts, in which the underlying state law provides that a contract for deed is executory, have ruled that such state law should be followed in bankruptcy. *See, e.g. In re Anderson*, 36 B.R. 120, 124 (Bankr.D.Hawaii 1983) (following Supreme Court of Hawaii's definition of land sales contract as executory and emphasizing that contract purchasers, bypassing substantial

down payment requirements and loan to value ratios imposed by lending institutions for conventional, state and federal mortgage programs, "are not entitled to be treated as if they were mortgagors."); and *In re Carver*, 14 C.B.C.2d 1160, 43 B.R. 605 (Bankr.D.S.D.1986) (contract for deed is executory and not a security device, because remedies of a contract vendor and a mortgagee are different under South Dakota's land foreclosure law). These cases follow the same logic of *Shaw v. Dawson* and *Waldon*. This Court concludes that the contracts in this case are executory in nature under the law of the States of New Mexico and Texas and are deemed to be executory in this Chapter 12 case.

■ 24. Upon finding that the contracts in question are executory, this Court is aware that the Debtor has planted crops on this property and it would be a financial hardship on the Debtor to require it to surrender possession of the property prior to having an opportunity to harvest crops. For this reason the Debtor should be given until December 1, 1987 to accept or reject the executory contracts. Debtor will however be required to begin making monthly payments for adequate protection. In this regard the Court notes that all parties agreed that the sum of $21,200.00 per year would be a reasonable rental value for the farm and ranch properties. On a monthly basis this equates to $1,766.67. Based upon the facts and equities in this case, this Court finds that the automatic stay should remain in full force and effect and the Debtor should be given until December 1, 1987 to assume or reject the contracts, conditioned upon making monthly payments of $1,766.67 to B.F.W., with the first payment to commence on the first day of August 1987 and to continue on the first day of each month thereafter until such time as the contract is assumed or rejected. Debtor should also, on or before 1:00 p.m. on December 1, 1987, either accept or reject the executory contracts with B.F.W. Any acceptance should be in writing and delivered to the attorney for B.F.W. with a copy filed with the Clerk of the Court. Any rejection occurring prior to December 1, 1987 shall cause Debtor to immediately surrender possession of the property to B.F.W. If Debtor accepts the contracts, it shall at the same time provide the cure or other assurances required by 11 U.S.C. § 365. Any failure to make the monthly adequate protection payments until such executory contract is accepted, shall be deemed a rejection of the executory contracts.

An Order consistent with these findings and conclusions will be separately entered of even date herewith.