In re SLEEPY VALLEY, INC., Debtor.

SLEEPY VALLEY, INC., Plaintiff,

v.

LEISURE VALLEY, INC., and Coronado Bank, Defendants.

Bankruptcy No. 3–86–00506.
Adv. No. 3–86–0075.

United States Bankruptcy Court,
W.D. Texas,
El Paso Division.

Sept. 6, 1988.

Corey W. Haugland, Grambling & Mounce, El Paso, Tex., for Sleepy Valley, Inc.

William B. Hardie, Jr., Hardie, Hallmark, Sergent, Hardie & Langford, El Paso, Tex., for Leisure Valley, Inc.

## OPINION AND ORDER

LEIF M. CLARK, Bankruptcy Judge.

Sleepy Valley, Inc., the debtor and plaintiff in this case, sells vacation tracts on contracts for deed. Prior to the filing of this bankruptcy, the principal for Sleepy Valley, Mr. Leo Wilson, was engaged in the business with Mr. O.B. Haley. The parties subsequently fell into dispute and literally parted company, with Mr. Wilson acquiring Sleepy Valley and Mr. Haley taking Leisure Valley. In the course of the dispute, Leisure Valley obtained a money judgment against Sleepy Valley for $81,376. After the judgment became final, but pending its enforcement, counsel for the parties met to discuss a possible settlement. During settlement negotiations, counsel for Sleepy Valley furnished Leisure Valley with certain financial data disclosing the existence and location of Sleepy Valley's bank accounts and real estate.

Leisure Valley made good use of its newfound information, filing abstracts of judgment in the appropriate counties, and thereby placed judicial liens on the debtor's real property. Tex.Prop.Code Ann. § 52.001 (Vernon 1984). Leisure Valley also caused a writ of garnishment to be served on Coronado Bank where the debtor held a checking and savings account. Not until one of its bank accounts had been garnished did the debtor discover that Leisure Valley had taken such blatant advantage of the debtor's candor in the settlement negotiations. Immediately thereafter, on July 15, 1986, Sleepy Valley filed bankruptcy under Chapter 11.

Sleepy Valley now brings this adversary proceeding to avoid Leisure Valley's judgment lien and garnishment as preferential transfers under Section 547 of the Bankruptcy Code, and to compel turnover of the garnished funds pursuant to Section 542. Sleepy Valley also seeks to equitably subordinate Leisure Valley's claim to those of other unsecured claimants under the provisions of Section 510(c). This matter comes to the Court as a core proceeding as defined by 28 U.S.C. § 157(b)(2)(F), (K), and (O), with jurisdiction conferred by 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a) and (b)(1), and this District's general order of reference.

After a trial of the case, the Court determined that all elements of a preference had been established, save for the debtor's insolvency. The Court took under advisement the insolvency and turnover questions as well as the equitable subordination issue.

## I. INSOLVENCY

The Court determined at the trial that transfers occurred on June 10, 1986 and July 7, 1986 when judicial liens were placed on the debtor's real property. 11 U.S.C. §§ 101(50), 547(e); *In re Ridgley*, 81 B.R. 65, 67 (Bankr.D.Or.1987); *Matter of Lively*, 74 B.R. 238, 239 (S.D.Ga.1987). A transfer also occurred on July 11, 1986, when the writ of garnishment was served on the

bank.[1] The remaining element for a preferential transfer, that of the debtor's insolvency, must be determined with respect to these dates. *In re Art Shirt Ltd., Inc.,* 68 B.R. 316, 322 (Bankr.E.D.Pa.1986); 11 U.S. C. § 547(b).

The plaintiff has the burden of proving a preference, 11 U.S.C. § 547(g), but is aided by the rebuttable presumption that the debtor is insolvent on or during the 90 days immediately preceding the date the petition is filed. 11 U.S.C. § 547(f). To overcome the presumption, the defendant's evidence must "raise a substantial doubt in the mind of the trier of fact as to the existence of the presumed fact." B. Russell, *Bankruptcy Evidence Manual,* § 301.3 (West 1987). The ultimate burden of proof, however, remains on the party in whose favor the presumption exists. *Matter of Emerald Oil Co.,* 695 F.2d 833, 838 (5th Cir. 1983); H.Rep. No. 595, 95th Cong., 1st Sess. 372–375 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6328–6331; Fed. R.Evid. 301. The Court determined at the trial that each transfer was made within the 90 day prepetition window. Leisure Valley is thus charged with overcoming the Section 547(f) insolvency presumption.

■■■■ Generally, a corporation is deemed "balance sheet" insolvent for pref-

erence purposes if the sum of its debts exceeds all of the entity's property at fair valuation, exclusive of certain items not relevant here. 11 U.S.C. § 101(31). Courts are in general agreement that "fair value" is neither the worst-case nor best-case scenario. Rather, the assets should be valued at that price obtainable in the market if sold in a prudent manner over a reasonable period of time. *In re Southern Industrial Banking Corporation,* 71 B.R. 351 (Bankr. E.D.Tenn.1987); *In re F & S Central Manufacturing Corporation,* 53 B.R. 842 (Bankr.E.D.N.Y.1985).[2] On the other side of the ledger, a debt is broadly defined by Sections 101(4) and (11) as virtually any legal obligation of the debtor, whether liquidated or unliquidated, matured or unmatured, and however remote or contingent. H.Rep. No. 595, 95th Cong., 1st Sess. 308–314 (1977), U.S.Code Cong. & Admin.News 1978, pp. 6265–6271.[3]

At trial, Leisure Valley submitted the debtor's 1986 tax return and balance sheets as of May and July, 1986, which periods span the transfer dates.[4] Both balance sheets indicated on their face that the debtor's liabilities exceeded assets by some $73,000. The defendant supplemented the balance sheet exhibits with testimony that the assets were undervalued and the debts

---

1. Under Texas law, a writ of garnishment fixes a lien in favor of the garnishor on the date of service, and thus perfects the transfer for preference purposes. *Matter of Latham,* 823 F.2d 108 (5th Cir.1987); *In re Rosenfield,* 62 B.R. 515, 525 (Bankr.N.D.Tex.1986); 11 U.S.C. § 547(e).

2. Assets not readily susceptible to voluntary liquidation, however, should be discounted. *Briden v. Foley,* 776 F.2d 379 (1st Cir.1985).

3. *But see* footnote 7, suggesting that the statutory definition may be too broad for § 547 purposes.

4. The balance sheets presented by the Defendant were unaudited and compiled by the debtor's bookkeeper, Terry Wilson, who admittedly had no accounting training. The Court notes at the outset that financial statements do not alone satisfy the Court's inquiry into "balance sheet insolvency," the test of insolvency required to satisfy Section 547(b)(3). *In re Art Shirt Ltd., Inc.,* 68 B.R. 316, 322 (Bankr.E.D.Pa.1986); H.Rep. No. 595, 95th Cong., 1st Sess. 308–314 (1977), U.S.Code Cong. & Admin.News 1978, pp.

6265–6271. Accountants ordinarily value assets and liabilities for balance sheet purposes according to generally accepted accounting principles (GAAP). Assets, for instance, are typically valued at book value or cost rather than fair market value. *See,* H. Sellin, *Attorney's Handbook of Accounting,* S. 1.04[1] ) (Matthew Bender 1987). What may be placed in the asset or liability columns by an accountant, may not be "property" or "debts" under the Bankruptcy Code. Consequently, the mere production of accounting balance sheets cannot place into doubt the debtor's insolvency, especially where, as here, the balance sheets themselves are of dubious accuracy.

Financial statements can be useful, however, as a starting point for the Court's inquiry. If unaudited, the financial statements should be substantiated; if not prepared according to GAAP, the valuation basis should be disclosed. These steps are necessary so that the Court has a baseline for translating, as it were, the stated values to fair values as called for by § 101(31). In this regard, appraisal testimony would also be useful in supplying independent valuations or to otherwise corroborate scheduled values.

overstated. Specifically, Leisure Valley took issue with the treatment given the interest owned by the debtor in the La Sombra joint venture, and with the propriety of accruing Wages Payable and Deferred Income as liabilities. The plaintiff countered with evidence suggesting that the Note Payable to Leisure Valley did not reflect the total debt, while the Contracts Receivable account was overstated. The plaintiff supported its position with certified copies of the bankruptcy schedules and a liquidation analysis introduced through testimony.[5] The schedules showed a negative net worth as of the petition date of $29,752. The liquidation analysis was similarly oriented.

Given the inherently fallible nature of the valuation process, the Court has chosen to use a dynamic model, or moving range of values, to determine the debtor's solvency on the transfer date. Accordingly, the Court has determined that undisputed assets range from $5,094 to $15,398, and undisputed liabilities range from $43,762 to $50,209.[6] From this starting point, each entry disputed above will be addressed in turn.

Prior to bankruptcy, Sleepy Valley's interest in the La Sombra joint venture was valued on the books at $35,697, which is the same as that indicated in the tax forms for the debtor's capital account in the partnership. The defendants argued that the book value is not a true indicator of the value of the property which is owned by the partnership, yet it would be erroneous to value the partnership interest as a mere percentage of the partnership assets, as the defendant suggests, without also accounting for the corresponding interest in partnership liabilities. Moreover, it is not the hypothetical liquidation of the partnership assets which is at issue here. Rather, it is the liquidation of the *interest* in the partnership.

---

**5.** The schedules filed with the bankruptcy petition may fare a somewhat less exacting review. Bankruptcy schedules must be prepared in accordance with the official forms. Bankruptcy Rule 1007(b). The forms require that assets be listed at "market value" and that liabilities include all "claims against the debtor or debtor's property." *See* Official Forms 6, 10. The valuation bases required for the debtor's schedules appear to be similar to those contemplated by § 101(31) and need less "translation." Moreover, since the transfers here occurred within 8 days of the petition date, the bankruptcy schedules should provide a snap-shot of the net worth of the debtor on the date of the transfers. "The verified schedules of a bankrupt, containing a presumptively complete list of assets and liabilities, are admissible as evidence of the bankrupt's insolvency at the time of a particular transaction, where, as here, the transaction occurred shortly before the bankruptcy and without opportunity for any great change in either property or debts." *Matter of Randall Construc-*

*tion, Inc.,* 20 B.R. 179, 184 (N.D.Ohio 1981); *See also Haynes & Hubbard, Inc. v. Stewart,* 387 F.2d 906, 907 n. 1 (5th Cir.1967). From the evidence presented at trial, the Court notes no change of substance in the debtor's financial status during the interim period, except for a new $7,700 liability reserved for the bankruptcy attorney. This debt clearly did not exist on the critical date and is disregarded in the following analysis. In addition, the classification of some accounts may depend on whether the snap-shot is taken pre- or post-petition. (e.g. executory contracts and contingent claims. *See* footnote 7, *infra.*).

**6.** The Court arrived at these figures by adding together those accounts in the following schedules which were not addressed by the parties. They are deemed to be undisputed. The other entries represent those accounts which are questioned by the litigants and will be addressed separately in the analysis. This is the Court's starting point.

|  | 1986 Balance Sheets | | Bankruptcy |
|  | May | July | Schedules |
| --- | --- | --- | --- |
| Undisputed Assets (Net) | $ 15,398 | $ 11,388 | $ 5,094 |
| Undisputed Liabilities | 50,209 | 43,762 | 47,876 |
| La Sombra Joint Venture | 35,697 | 35,697 | (a) |
| Wages Payable | 43,650 | 45,500 | 45,505 |
| Deferred Income | 117,998 | 114,135 | (b) |
| Judgment Payable to Leisure Valley | 37,000 | 37,000 | 81,376 |
| Contracts Receivable | 123,127 | 119,666 | 120,764 |

(a) Omitted as unreliable.

(b) Not scheduled.

To this end, two "offers" were made at trial. Mr. Haley testified that he would be willing to forego one-half of his judgment against Sleepy Valley in exchange for the partnership interest. One-half of the judgment amounts to approximately $40,688, exclusive of interest and attorney fees. Such an offer might otherwise give an indication of the fair value of the partnership interest, but the offer made at trial must be discounted for the fact that Mr. Haley knew his judgment might be deemed unsecured by the outcome of this proceeding, and further subordinated to other debts owed by the bankrupt. It cannot be said, then, that Mr. Haley would have been equally willing to pay $40,688 in cash, or even to forego one-half of the judgment, at the time of the transfers.

Mr. Wilson also gave an indication of what he thought the partnership interest was worth, testifying that he "would walk away" if he could just get his expenses out of the project. The Court infers that Mr. Wilson was alluding to his $35,697 capital account, which is essentially whatever a partner has put into a venture, adjusted by a percentage of earnings or losses, and less anything taken out. *See* H. Sellin, *Attorney's Handbook of Accounting*, 3rd ed., S. 10.01 (Matthew Bender 1987). From this, the Court concludes that the value of the partnership interest is no greater than the debtor's asking price of $35,697. The value may indeed be less since Mr. Wilson also testified that he had as yet no takers for his offer to sell.

Leisure Valley also contests the validity of Wages Payable, listed as $43,650 and $45,500 in the May and July, 1986 Balance Sheets respectively, and as $45,505 in the bankruptcy schedules. As explained at trial, the accounts reflect approximately 30 months of wages which went unpaid because of the debtor's cash flow problems. The defendant argues that, because the unpaid wages are owed to the principals, the item should be deleted or at least construed as equity rather than as a true liability. The defendant notes that there was no formal written agreement or employment contract and that the principals took money out of the company on an irregular basis, suggesting that no regular salary was ever intended and that none should now be presumed. However, the bookkeeper testified that when they were business associates, Mr. Haley and Mr. Wilson agreed that they would each receive $1000 per month salary, and that Mrs. Wilson would receive $350 per month. Mr. Wilson also testified that he spends 30 hours per month running the corporation (Mr. Haley said it only takes him 1 hour per month to manage the similar Leisure Valley business). The Court notes that the agreed salary may be somewhat excessive and that a portion of the wages payable may indeed be attributable to an expected, albeit unrealized, return on capital. As these funds were not distributed, a portion necessarily remains in the equity accounts and should not be classified as a liability of the corporation.

The Court takes judicial notice of the bankruptcy case file underlying this adversary, and particularly of a Motion to appoint a Trustee. The Motion proposed that a Trustee be appointed to run all operations of the corporation with a suggested salary of $300 per month. The role of a Trustee, even for a Chapter 11 debtor, is essentially that of a receiver. A receiver typically lacks the continuing interest in an entity which is held by its owners. It is therefore reasonable to assume that a higher salary would be paid to an owner/manager who brings to the job his particular skills and know-how and who, because of his ownership interest, will give an extra effort to the corporation's affairs. The Court has been given no further guidance in arriving at an appropriate salary figure, however, and therefore finds that the monthly accrual should be no less than that offered to a potential trustee of $9,000 for 30 months, and should be no higher than the $40,500 testified to by the Wilsons.

Leisure Valley last argued that deferred income, listed as $117,998 on the May statement and as $114,135 for July, is not a true "debt" of the corporation. The bookkeeper was not able to explain the source of the

account, nor did the defendants call an expert witness to assess its accounting treatment.[7] The Court is persuaded, however, by the absence of an entry for deferred income in the debtor's bankruptcy petition. Evidently, the debtor concedes that deferred income is not a "claim against the debtor," which would need to be satisfied upon liquidation, but may actually be a "phantom" liability as the defendant suggests. *See In re Central Hobron Associates*, 41 B.R. 444, 448 (D.Haw.1984) (Deferred income is not a "debt" for

§ 303(h)(1) evaluation). Accordingly, this amount should be stricken from the liability side of the balance sheet.

Considering only those entries adjusted as a result of the defendant's evidence, the net worth of Sleepy Valley on the date of the transfer initially appears to have been between <$8,197> and $78,013. Having thus determined that the defendant has raised a substantial doubt as to the solvency of the debtor, the Court now turns to the plaintiff's proposed adjustments.

---

7. The Court notes an apparent correspondence between the asset "Contracts Receivable" and the liability "Deferred Income." Their balances are nearly equal and each comprises the lion's share of its respective side of the ledger. Together, these accounts evidently represent the debtor's interest in the Contracts for Deed. As land sales were executed, these accounts were likely set up as counter-balancing entries. As payments were then received, deferred income was amortized to income over the term of the contracts.

The Contracts Receivable account represents a legal right to periodic payment, and even though the contract "remains wholly executory," the contract right, once assumed, becomes property of the bankruptcy estate under § 541. *In re S.O.A.W. Enterprises, Inc.*, 32 B.R. 279, 284 (Bankr.W.D.Tex.1983); *In re Rancho Chamberino*, 77 B.R. 555 (Bankr.W.D.Tex.1987); *Matter of Tonry*, 724 F.2d 467 (5th Cir.1984) ("Unlike other assets of the debtor, the interest in an executory contract ... only attaches upon the trustee's assumption of the executory contract.") 724 F.2d at 469. Thus, the debtor's prepetition contract right in the contracts for deed are justifiably characterized as property for purposes of the § 101(31) insolvency analysis.

It could also be argued that the Deferred Income account somehow memorializes Sleepy Valley's corresponding legal obligations under the executory land sales contracts. Certainly, Sleepy Valley was legally bound on the transfer date to deliver deeds to the buyers upon their payment in full. Absent evidence of actual default on Sleepy Valley's part at the transfer date, however, this Court is reluctant to find that a *balance sheet* claim existed prepetition. Moreover, there is no reason to believe that, were there a cognizable balance sheet debt to the vendees, its amount would in any way correspond to that allocated for deferred income. The court therefore finds that this account is not intended to represent contract obligations (nor should such an account be established) but that it is solely an accounting mechanism for recognizing periodic income.

The Court reaches this conclusion despite the liberal construction given "claims" in § 101(4) to permit the "broadest possible relief in the bankruptcy court." H.Rep. No. 595, 95th Cong., 1st Sess. 308–314 (1977), U.S.Code Cong. & Admin.News 1978, pp. 6265–6271. As the Supreme Court noted in *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 530 n. 12, 104 S.Ct. 1188, 1198 n. 12, 79 L.Ed.2d 482 (1984), contingent and unliquidated claims must be disclosed and estimated under § 502 for the "purposes of settling a bankrupt estate." That policy is not triggered where the Court is merely trying to gauge an entity's solvency as of a certain *prepetition* date, nor is there need to embrace all claims, however contingent. In any event, there was no present "right to payment" on the transfer date and hence, whatever claim there may have been, was at the time worth nothing. 11 U.S.C. § 101(4).

The Court is not passing on the issue whether nondebtor parties to an executory contract are claimants in the bankruptcy proceeding, though this topic has inspired some recent debate.

With respect to the status of a nondebtor party to an executory contract that has not been assumed, rejected, or otherwise breached, the general sense of the Committee and the Conference ... is that the nondebtor party has a contingent claim under S 101(4) ... (so that) if the debtor breaches, a claim arises....

Report of the Committee on Claims and Distributions, Summary of Proceedings of the Annual Meeting of the National Bankruptcy Conference, October 30–31, 1987, *reprinted in* West's Bankruptcy Newsletter, Bankruptcy Advance Sheets, Vol. 11, at 23–24 (May 24, 1988). The Committee indicated that the issue is far from settled, and referred the matter to a subcommittee for further review. *Cf. Matter of M. Frenville Company, Inc.*, 744 F.2d 332 (3rd Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985) (a "right to payment" must be determined with respect to state law, so that a prepetition act which results in a postpetition cause of action may not be a claim in bankruptcy), *with Grady v. A.H. Robins Company, Inc.*, 839 F.2d 198 (4th Cir.1988) (the federal definition of "claim" and its attendant legislative history indicates that any prepetition act which may result in a cause of action is "contingent" and is therefore a "claim" for bankruptcy purposes).

Sleepy Valley voiced objections to the values listed in the schedules for the Judgment Payable and Contracts Receivable accounts. The bookkeeper testified that the debt owing to the defendant had been carried on the books for years at $37,000, until Leisure Valley obtained judgment on the debt in the uncontroverted amount of $81,376. To that extent, the balance sheets understate the judgment debt.

Finally, Sleepy Valley contends that the Contracts Receivable amount is an inflated figure valued at gross receipts. The balance is neither discounted to present value nor reduced for doubtful collections. Sleepy Valley can expect a certain percentage of vendees to default under their contracts, and the balance sheets should so reflect this contingency. The Court is convinced that the Contracts Receivable account must be reduced by some amount, though the parties offered little evidence which would aid the Court in choosing the appropriate index. It is reasonable to assume that at least 5% of Contracts Receivables will prove to be uncollectible.[8] Second, the receivables account must also be discounted to reflect its present value at transfer date. Using capitalization rates of 8% and 10% (rates common in the real estate industry in 1986), the Court finds present value at transfer date to be $90,725 to $98,320. Subtracting 5% for doubtful collections, the Court arrives at an *adjusted* book value of $86,188 to $88,680.[9]

The Court must now consider what price might be obtainable for the Contracts Receivable account through voluntary liquidation. Mr. Wilson provided the only credible testimony in this regard, stating that there was no current market for this asset and that he could only hope to obtain 50 cents on the dollar (based on *face* value), or approximately $60,000. The Court need only take judicial notice of the state of the economy in Texas to agree that the Con-

tracts Receivable account is somewhat overstated. Where there is no ready market for an asset, it is appropriate to write down its book value for the purpose of determining an entity's solvency. *Briden v. Foley*, 776 F.2d 379, 382 (1st Cir.1985). The Court accepts Mr. Wilson's testimony as the appropriate write-down of 30% off the *adjusted* book value computed above, as this percentage is not unreasonable and was uncontroverted by the defendants. The Court therefore finds that the fair value of the Contracts Receivable account as of the transfer date was $60,000.

After plugging the fair values derived by the Court into the schedules submitted by the parties, the Court finds that Sleepy Valley had a negative net worth on the transfer date of some $27,000 to $69,000. The plaintiff has thus sustained its burden of proving insolvency, and with the last element of a preference established, the Court concludes that the judgment lien and garnishment were preferential transfers which may be avoided by the Debtor in Possession. 11 U.S.C. § 547. In addition, the Court finds that the bank account should be released from its garnishment and the funds turned over to the Debtor pursuant to Section 542(b) of the Bankruptcy Code.[10]

## II. EQUITABLE SUBORDINATION

Sleepy Valley also maintains that Leisure Valley's bad faith in the settlement negotiations warrants subordination of its claim under Section 510(c), which provides that the court may "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim...." 11 U.S.C. § 510(c)(1). The gravamen of the debtor's complaint is that Leisure Valley took liberties with information provided in confidence to gain an

---

8. The 5% reduction should be applied to the present value, rather than the book value stated at gross, as computed *infra*.

9. The bookkeeper testified that the contracts would pay out between 1990 and 1992. A five year annuity period is therefore used, with pay-

ments assumed to be made in equal annual installments.

10. The Court notes that Coronado Bank is not listed as a creditor on the debtor's bankruptcy schedules and thus appears to have no offset defense to § 542.

unfair advantage over other creditors. By abstracting judgment on the disclosed properties, Leisure Valley achieved an enhanced bargaining position. i.e. Sleepy Valley could not deliver unencumbered deeds as the contracts paid out without Leisure Valley's cooperation.

■ The elements required for equitable subordination are generally known and undisputed:

(i) The claimant must have engaged in some type of inequitable conduct,

(ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant, and

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code].

*Matter of Mobile Steel Company*, 563 F.2d 692, 700 (5th Cir.1977). *Accord Matter of Multiponics, Inc.*, 622 F.2d 709, 713 (5th Cir.1980); *Matter of Missionary Baptist Foundation of America, Inc.*, 712 F.2d 206, 212 (5th Cir.1983).

In determining whether the defendant engaged in misconduct, the Court must first consider whether Leisure Valley was an insider or if the defendant should otherwise be held to a fiduciary's duty of fair dealing. The claimant's role, in turn, decides how the burden of proof is allocated and fixes the standard of scrutiny to be applied by the Court in evaluating the claimant's conduct.[11]

■ In the present case, it is clear that Leisure Valley is neither an insider nor an affiliate of Sleepy Valley.[12] Although Mr. Haley and Mr. Wilson are former partners, they split up four years prior to the alleged inequitable conduct. There was insufficient evidence presented at trial to show that there is some sort of continuing joint venture. Leisure Valley presently holds no ownership interest in Sleepy Valley, it is not an officer or director, and its principal does not control or manage the affairs of the debtor.

**11.** A verified proof of claim establishes the claimant's prima facie case both for the validity of the claim and for the purpose of meeting an equitable subordination challenge, as the latter is considered a "defense," of sorts, to a creditor's claim. Thus, the party seeking to subordinate the claim must come forward with sufficient proof to justify modifying the claim's priority. *Matter of Mobile Steel Company*, 563 F.2d 692, 701 (5th Cir.1977). If the claimant is a non-insider, the burden of proof remains on the objectant throughout. *In re Osborne*, 42 B.R. 988, 996 (W.D.Wis.1984). However, if the claimant is an insider, fiduciary, or alter ego, the burden beings with the objectant, but shifts to the claimant to prove the integrity of the claim once there is a substantial factual showing of inequitable conduct. *Mobile Steel*, 563 F.2d at 701–02.

As the Supreme Court first outlined in *Pepper v. Litton* as to officers, directors, and stockholders, "Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness...." *Pepper v. Litton*, 308 U.S. 295, 306; 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939). This doctrine has been extended to non-insiders as well. *Matter of Vietri Homes, Inc.*, 58 B.R. 663 (Bankr.D.Del.1986) (construction lender's assumption of debtor's disbursement obligations cast lender in role of fiduciary to other creditors); *In re T.E. Mercer Trucking Company*, 16 B.R. 176 (Bankr.N.D.Tex.1981) (lender who insisted on joint control of debtor's checking account, position on Board of Directors, and complete veto powers on day-to-day matters may be considered an alter ego and should be held to higher standard). The higher fiduciary standard will not be imputed to non-insiders, however, unless the claimant's influence over the debtor's affairs is substantial. *Matter of Teltronics Services, Inc.*, 29 B.R. 139, 171 (Bankr.E.D.N.Y.1983). *See also In re Beverages International Ltd.*, 50 B.R. 273, 282 (Bankr. D.Mass.1985) (claimant's duty of fair play increases proportionately with degree of control over debtor's affairs). Moreover, the burden of proving that one is an insider, fiduciary, or alter ego rests with the party so alleging. *See Rader v. Boyd*, 252 F.2d 585, 587 (10th Cir.1957).

**12.** The Fifth Circuit has adopted a rather expansive reading of "insider," referring to the Bankruptcy Code's definition in § 101(30) and the related section defining affiliates at § 101(2). *Matter of Missionary Baptist Foundation of America, Inc.*, 712 F.2d 206, 210–11 (5th Cir. 1983). The Court does not explain, however, why a *statutory* definition should attach to a *court-made* doctrine. *See* 124 Cong.Rec.H 11095, H 11113 (Sept. 28, 1978) (remarks of Rep. Edwards) ("It is intended that the term 'principles of equitable subordination' follow existing case law and leave to the courts development of this principle").

Further, there was no evidence presented which would indicate that Leisure Valley made any representations to other creditors which would place the defendant in the role of an inadvertent fiduciary. Nor has Leisure Valley become an alter ego of the debtor. Although Leisure Valley achieved a leveraged bargaining position by placing a lien on the real property subject to the contracts for deeds, the defendant in no way attained the heightened degree of control which is necessary to be considered an alter ego.

> (A) non-insider creditor will be held to a fiduciary standard only where his ability to command the debtor's obedience to his policy directives is so overwhelming that there has been, to some extent, a merger of identity. Unless the creditor has become, in effect, the *alter ego* of the debtor, he will not be held to an ethical duty in excess of the morals of the marketplace.

*Matter of Teltronics Services, Inc.*, 29 B.R. 139, 171 (Bankr.E.D.N.Y.1983). The Court therefore finds that Leisure Valley is not an insider, fiduciary, or alter ego of the debtor. Accordingly, Sleepy Valley must prove that Leisure Valley's conduct was "egregious" in order to prevail under Section 510(c). *In re N & D Properties, Inc.*, 799 F.2d 726, 731 (11th Cir.1986); *In re Pacific Express, Inc.*, 69 B.R. 112, 117 (9th Cir. BAP 1986) (must prove "gross misconduct tantamount to 'fraud, overreaching or spoliation to the detriment of others.'" [citations omitted.]).

The courts have developed a list of recognized "bad acts" which might justify subordination under equitable principles: (1) fraud, illegality, breach of fiduciary duties; (2) undercapitalization; and (3) claimant's use of the debtor as a mere instrumentality or alter ego. *Matter of Missionary Baptist Foundation of America, Inc.*, 712 F.2d 206, 212 (5th Cir.1983). At least one court has suggested that un-

der certain circumstances, something less than actual fraud may suffice.[13] *In re Beverages International Ltd.*, 50 B.R. 273, 281–82 (Bankr.D.Mass.1985). In keeping with the Fifth Circuit directive to differentiate the scrutiny to be applied to non-insiders though, this Court is reluctant at this juncture to use a lower standard. In any event, based on the evidence adduced at trial, the Court finds no misconduct which would satisfy the first prong of the *Mobile* test under either standard. Leisure Valley engaged in what may be considered hard ball tactics, but the court cannot find that their actions were anything more than the due diligence of a creditor attempting to secure performance of the debtor's obligation. "The permissible parameters of a creditor's efforts to seek collection from a debtor are generally those with respect to voidable preferences and fraudulent conveyances proscribed by the Bankruptcy Act; apart from these there is generally no objection to a creditor's using his bargaining position ... to improve the status of his existing claims." *In re W.T. Grant Company*, 699 F.2d 599, 610 (2d Cir.1983), *cert. denied*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

The Court is equally unable to find that other creditors were injured or that the defendant achieved an unfair advantage as a result of their actions. Certainly, Leisure Valley improved its position by executing on its judgment, but the plaintiff failed to show how these actions were detrimental to other creditors. To the contrary, the evidence showed that Sleepy Valley was able to obtain partial releases from Leisure Valley so that the debtor could deliver deeds under contract. Whatever advantage the defendant obtained was at least mitigated by Leisure Valley's apparent, if not coerced, cooperation. Moreover, the Court has here avoided Leisure Valley's liens as preferential transfers, so that any bargaining imbalance has now been recti-

---

13. "Inequitable conduct is that conduct which may be lawful, yet shocks one's good conscience. It means, *inter alia*, a secret or open fraud; lack of faith or guardianship by a fiduciary; an unjust enrichment, not enrichment by bon chance, astuteness or business acumen, but enrichment through another's loss brought about by one's own unconscionable, unjust, unfair, close, or double dealing or foul conduct." *Matter of Harvest Milling Company*, 221 F.Supp. 836, 838 (D.Ore.1963).

fied. Since the doctrine of equitable subordination is remedial rather than penal, absent a continuing injury to other creditors, equitable remedies are unavailable. *Matter of Mobile Steel Company*, 563 F.2d 692 (5th Cir.1977).

For the foregoing reasons, the Court finds that the defendant's conduct was not of the "egregious" sort necessary to invoke equitable principles, and that other creditors were not injured thereby. Therefore, Leisure Valley's claim should not be subordinated.

### CONCLUSION

The Court, having made its findings of fact and conclusions of law herein, therefore

ORDERS that judgment be entered in favor of the Plaintiff on the issues of preferential transfer and turnover, and in favor of the defendant for the claim for equitable subordination. All further relief not expressly granted is hereby denied.