**In re DOSKOCIL COMPANIES INCORPORATED, et al.,**
**Debtors.**

**Bankruptcy Nos. 90–40414–11 to 90–40432–11.**

United States Bankruptcy Court, D. Kansas.

Aug. 7, 1991.

See also 130 B.R. 870.

Dennis Dow and Mark Moedritzer of Shook, Hardy & Bacon, Kansas City, Mo., and Isaac M. Pachulski of Stutman, Treister & Glatt, for debtors.

Cynthia F. Grimes of Lewis, Rice & Fingersh and John Lee of Andrews & Kurth, for the Official Unsecured Creditors' Committee of Doskocil Companies Inc.

Christopher J. Redmond of Redmond, Redmond & Nazar and Barbara Rom of Pepper, Hamilton & Scheetz, for the Official Unsecured Creditors' Committee of Wilson Foods Corp.

Paul Hoffman of Smith, Gill, Fisher & Butts and Margot Schonholtz of Zalkin, Rodin & Goodman, for the Chemical Bank and the Bank Group.

John Sutter and Nancy Heermans, Washington, D.C., Tanya Wilson of the U.S. Attorney's Office, for the PBGC.

James M. Holmberg of Lentz & Clark, for the Official Section 1114 Retirees' Committee.

Joel Pelofsky of Shughart, Thomson & Kilroy, for the Doskocil Equity Committee.

Tanya Wilson of the U.S. Attorney's Office, for the U.S. Dept. of Agriculture.

William F. Schantz, for the U.S. Trustee.

## MEMORANDUM OF DECISION ON DEBTOR'S MOTION FOR SUMMARY JUDGMENT

JOHN T. FLANNAGAN, Bankruptcy Judge.

Debtor filed a motion for summary judgment on its objections to proofs of claim filed by the Pension Benefit Guaranty Corporation (the "PBGC"). The PBGC filed an opposition brief urging that its proofs of claim are supported by a claim upon which relief can be granted against the debtor under the Employee Retirement Income Security Act of 1974, as amended ("ERISA")[1].

### Issue

The broad issue is whether under the Employee Retirement Income Security Act of 1974, as amended, the PBGC holds a claim upon which relief can be granted

---

1. Although the proper citation for sections of ERISA is to the statutes at large, in this decision all references will be to sections of 29 U.S.C.

against the debtor for payment of underfunded pension benefits.

The Court rules that the PBGC's bankruptcy claims are not allowable under Bankruptcy Code § 502(b)(1) because the PBGC does not hold under the Employee Retirement Income Security Act of 1974, as amended, claims upon which relief can be granted against the debtor for the underfunded pension benefits.

### Jurisdiction

The parties do not dispute that the issues raised by this contested matter are core in nature. The Court finds that the issues presented in this contested matter are core under 28 U.S.C. § 157 and that the Court has jurisdiction under 28 U.S.C. § 1334 and the general reference order of the United States District Court for the District of Kansas effective July 10, 1984.

### I.

### Background

The debtor, Wilson Foods Corporation, is a direct subsidiary of Doskocil Companies Incorporated and one of a jointly administered group of 19 companies in Chapter 11 before this Court.

In explaining the events leading to this controversy, we will make occasional reference to a company that was the debtor's predecessor. We will call this company "old Wilson." The debtor will be called "Wilson," or "new Wilson," or simply "debtor."

Old Wilson, which was also formally called Wilson Foods Corporation, filed Chapter 11 bankruptcy in the Western District of Oklahoma in 1983 and obtained confirmation of a reorganization plan on March 28, 1984. Just before and just after the confirmation date, old Wilson sold some of its assets. On March 12, 1984, it sold the assets of its meat processing operation located in Albert Lea, Minnesota, to Cornbelt Meats, Inc. ("Cornbelt"). On July 2, 1984, it sold the assets of its meat processing operation located in Cedar Rapids, Iowa, to Cedar Rapids Meats, Inc. ("Cedar Rapids").

In 1988, four years after old Wilson emerged from the Oklahoma Chapter 11 case, Doskocil Companies Incorporated purchased old Wilson in a leveraged buyout transaction involving the merger of old Wilson into a shell corporation.[2] Thus, new Wilson Foods Corporation, the same company that is now the debtor in this Chapter 11 case along with the other members of the Doskocil group, was born.

Before the sales to Cornbelt and Cedar Rapids, old Wilson had maintained a pension plan for its hourly employees. It referred to this plan as the "Hourly Plan." The Hourly Plan provided for payment of pension benefits to certain current and former employees, including those employees who had worked for old Wilson at its Cedar Rapids and Albert Lea facilities.

Under the terms of the sales of the Cedar Rapids and Albert Lea facilities, the Hourly Plan was divided into three plans, one covering employees, former employees and beneficiaries who worked at the Albert Lea facility; one covering employees, former employees and beneficiaries who worked at the Cedar Rapids facility; and one covering the remaining employees, former employees and beneficiaries of old Wilson.

The terms of the sales to Cornbelt and Cedar Rapids provided that each purchasing company would assume full responsibility for funding employee pension benefit obligations due under its particular newly formed benefit plan.

Before the sales, old Wilson received waivers allowing deferred payment of its pension plan contributions. After the sales, old Wilson continued making these contribution payments, but only to the extent of its obligations under the sale con-

---

**2.** Actually, the record in this contested matter does not show that there was a merger or which corporation survived—Wilson or the renamed shell. However, the Court knows from other hearings in this case that there was a merger. The debtor's brief does not treat this complication, so the Court will assume for the purposes of this opinion that old and new Wilson are the same entities with the same legal relationships.

tracts. Old Wilson paid its 1983 plan year contribution amount on September 15, 1984. It paid its 1984 partial plan year contribution amount on September 13, 1985. As a result of a 1980 waiver obtained by old Wilson, it paid pension benefits on September 13, 1985, September 12, 1986, September 14, 1987, and September 14, 1988.

On March 5, 1990, debtor filed this Chapter 11 case in the United States Bankruptcy Court for the District of Kansas.

On March 9, 1990, Cedar Rapids ceased operations and filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Iowa.

On March 14, 1990, Cornbelt ceased operations and filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Minnesota.

The PBGC has filed a proof of claim in the Cedar Rapids bankruptcy case for approximately $38 million of unfunded pension benefits and a proof of claim in the Cornbelt bankruptcy case for approximately $25 million.

The PBGC now asserts that under 29 U.S.C. § 1362, the debtor is liable for the amount of unfunded benefit liabilities due to the Cornbelt and Cedar Rapids pension plans. The PBGC has filed proofs of claim in this bankruptcy case for approximately $38 million and $25 million of unfunded pension benefits due under the Cedar Rapids and Cornbelt pension benefit plans, respectively. The proofs of claim state estimated amounts, assuming a plan termination date of March 5, 1990, for each of the pension plans. However, the PBGC's brief indicates that the Notices of Determination issued on February 7, 1991, establish October 1, 1990, as the termination date for the Cornbelt plan and June 13, 1990, as the termination date for the Cedar Rapids plan. Each of the proofs of claim filed in this case state: "If and when the termination date of the Plan is established pursuant to ERISA § 4048(a), 29 U.S.C. § 1348(a), the PBGC will amend this claim." (See paragraphs 18 of the PBGC's Cornbelt and Cedar Rapids proofs of claim for unfunded pension benefits.)

## Contentions

The debtor has filed its motion for summary judgment requesting that the Court find that the PBGC does not hold allowable claims against the debtor for the unfunded pension benefit liabilities for the Cedar Rapids and Cornbelt plans. The debtor offers three grounds for the disallowance of the PBGC claims: (1) that there is no theory under which the PBGC may recover from the debtor on its claims; (2) that any PBGC pension claims from the sales of the Cornbelt and Cedar Rapids facilities were discharged in old Wilson's prior bankruptcy; and (3) that the PBGC's claims should be disallowed under 11 U.S.C. § 502(e)(1)(B).

In the alternative, the debtor requests that if the Court finds that there are triable issues of material fact, it should limit the PBGC's claims to the lesser of (1) the amount of the unfunded guaranteed benefit liabilities under both plans as of the dates of the asset sales, or (2) 30 percent of old Wilson's net worth as of the dates of the asset sales. Finally, if summary judgment is denied, the debtor requests that on or before the hearing on confirmation, the Court estimate the amount of the PBGC claims for purposes of distribution under the debtor's plan of reorganization.

The PBGC responds that old Wilson sold the two companies with the principal purpose of avoiding their unfunded pension plan benefits and that debtor is now liable under ERISA for old Wilson's unfunded pension benefit liabilities.

In its opposition brief, the PBGC argues that the debtor is liable for unfunded Cedar Rapids and Cornbelt pension benefits under ERISA § 4062(b), 29 U.S.C. § 1362(b), whether or not the debtor is an "employer" or a "contributing sponsor" at the time the plans are terminated. The PBGC contends that alleged acts by the debtor in regard to Cornbelt and Cedar Rapids since 1986 constitute "transactions" within the meaning of ERISA § 4069(a), 29 U.S.C. § 1369(a);

therefore, the debtor is liable to the PBGC under this section as well. The PBGC argues that it held no claim against old Wilson at the time of its 1984 confirmation; hence, the PBGC's claims were not discharged. The PBGC argues that its claim fails to meet any of the criteria necessary for disallowance under § 502(e)(1)(B). Finally, the PBGC claims that according to ERISA § 4069(a), 29 U.S.C. § 1369(a), the debtor is liable for the entire unfunded amount accrued to the time the Cedar Rapids and Cornbelt plans are terminated and not just for the unfunded amount existing at the time the facilities were sold.

### Summary Judgment

■ Federal Rule of Civil Procedure 56, governing summary judgment, is made applicable to bankruptcy proceedings by Bankruptcy Rule 7056. Federal Rule of Bankruptcy Procedure 9014 makes summary judgment applicable to this contested matter.

The summary judgment rule provides that the Court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

In ruling on a motion for summary judgment, the Court must examine all evidence in the light most favorable to the nonmoving party. Summary judgment will be proper only if no inference can be deduced from the facts that allows the nonmoving party to prevail. Where different inferences may properly be drawn, the case is not one for summary judgment. *United States v. O'Block*, 788 F.2d 1433, 1435 (10th Cir.1986).

The United States Supreme Court in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), stated: "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the exist-

ence of any element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23, 106 S.Ct. at 2552.

In this case, the debtor filed its motion for summary judgment on June 10, 1991. The debtor's motion was accompanied by several exhibits, including an affidavit by consulting actuary Tamara Shelton opining on the underfunded amounts of the pension plans on the dates of sale. Also included were copies of the PBGC's claims and copies of both Purchase and Sale Agreements.

The PBGC filed its Opposition to the debtor's motion for summary judgment on June 25, 1991. It attached to the brief copies of old Wilson's Form 10–K for 1983 and 1984. The PBGC did not file affidavits with its brief, nor did it ask to submit copies of depositions or interrogatories, although it had conducted discovery for approximately one year.

The debtor states in its reply brief that the PBGC has had ample opportunity to discover relevant evidence. The PBGC served the debtor with a subpoena in February of 1990, and the debtor complied with the subpoena in May of 1990, furnishing the PBGC with thousands of pages of documents regarding the sales of the Cornbelt and Cedar Rapids facilities. Additionally, the PBGC failed to file an affidavit indicating that it is unable or somehow prevented from presenting facts by affidavit essential to justify its legal position.

The Court in *Celotex* held that a summary judgment motion may be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), "except the mere pleadings themselves...." *Id.* at 324, 106 S.Ct. at 2553. As set out above, the PBGC has presented no evidentiary materials for this Court to consider with debtor's motion for summary judgment; has failed to indicate that the evidence is unavailable; and has not asserted that the motion was heard

with inadequate notice or insufficient time for discovery.

Due to the PBGC's failure to present affidavit evidence concerning the factual allegations of its case, the Court finds that no genuine issues of material fact exist and this matter is ripe for summary judgment.

## II.

### *The Statutes*

Although the PBGC notes that the exact language of § 1362 at the time of the sale in 1984 is different from its language in 1986, it does not contend that the difference is significant to this determination. The Court believes that the 1984 version of § 1362, the one in effect at the time of the sale, is controlling. Under the terms of § 1362(b), liability for unfunded pension benefits can be asserted by the PBGC against any person who is, on the termination date of the plan, either a contributing sponsor or an employer, depending on which version of the statute applies.

The 1984 version of § 1362 that was applicable at the time of the sales of the Cornbelt and Cedar Rapids facilities speaks of the liability of an "employer" at the time of termination, while the 1986 version speaks of the liability of a "contributing sponsor" at the time of termination. The pertinent parts of the 1984 version are as follows:

**§ 1362. Liability of employer**

**(a) Employers covered**

This section applies to any employer who maintained a single-employer plan at the time it was terminated, but does not apply—

. . . .

**(b) Amount of liability**

Any employer to which this section applies shall be liable to the corporation, in an amount equal to the lesser of—

(1) the excess of—

. . . .

The 1986 version speaking of a "contributing sponsor" at the time of termination is as follows:

**§ 1362. Liability for termination of single-employer plans under a distress termination or a termination by corporation**

**(a) In general**

In any case in which a single-employer plan is terminated in a distress termination under section 1341(c) of this title or a termination otherwise instituted by the corporation under 1342 of this title, any person who is, on the termination date, a contributing sponsor of the plan or a member of such a contributing sponsor's controlled group shall incur liability under this section. The liability under this section of all such persons shall be joint and several. The liability under this section consists of—

(1) liability to the corporation, to the extent provided in subsection (b) of this section, and

(2) liability to the trustee appointed under subsection (b) or (c) of section 1342 of this title, to the extent provided in subsection (c) of this section.

Section 1369 creates an exception to the 1986 version of § 1362, placing termination liability on any person who enters into a transaction the principal purpose of which is to evade contributing sponsor liability. However, the statute does not apply to transactions occurring before January 1, 1986, as the endnote explains. The statute reads:

**§ 1369. Treatment of transactions to evade liability; corporate reorganization**

**(a) Treatment of transactions to evade liability**

If a principal purpose of any person in entering into any transaction is to evade liability to which such person would be subject under this subtitle and the transaction becomes effective within five years before the termination date of the termination on which such liability would be based, then such person and the members of such person's controlled group (deter-

mined as of the termination date) shall be subject to liability under this subtitle in connection with such termination as if such person were a contributing sponsor of the terminated plan as of the termination date. This subsection shall not cause any person to be liable under this subtitle in connection with such plan termination for any increases or improvements in the benefits provided under the plan which are adopted after the date on which the transaction referred to in the preceding sentence becomes effective.

**Historical and Statutory Notes**

**Effective Date.** Section 11013(b) of Pub.L. 99–272 provided that: "Section 4069(a) of the Employee Retirement Income Security Act of 1974 (as added by subsection (a)) [this section] shall apply with respect to the transactions becoming effective on or after January 1, 1986."

This statute will be referred to later in this part of the opinion under the treatment of whether the legislative history of ERISA justifies predecessor liability and in part II covering the effect of post-sale transactions.

*Plain Meaning of the Statute*

■ Unless legislative history is used to expand the plain meaning of its operative terms, § 1362 makes only a person who is an employer or a contributing sponsor *at the time of termination* liable for the unfunded pension benefits. The term "employer"[3] is self-explanatory and the term "contributing sponsor" is defined in § 4001(a)(13)(A) as a person or entity "who is responsible, in connection with such plan, for meeting the funding requirements under section 302 of this Act or section 412 of the Internal Revenue Code of 1954."

The PBGC stresses that the debtor continued to make payments to Cornbelt and Cedar Rapids for pension benefits after the sale. For this, it maintains the debtor

should be classified as an employer or contributing sponsor. However, the Court finds that the payments made after the sales were for presale pension benefits, some of which had been deferred by the debtor under a waiver obtained as early as 1980. Under the contracts for sale with Cedar Rapids and Cornbelt, the debtor agreed to continue making these payments for presale pension obligations. Fulfilling its contractual obligation under the sales agreements cannot make debtor an employer or contributing sponsor. From the plain meaning of the statutes unaided by the gloss of legislative history, the Court finds that after the sale of the Cornbelt and Cedar Rapids facilities in 1984, the debtor was no longer an employer or a contributing sponsor who was responsible under the Cedar Rapids and Cornbelt plans for meeting the funding requirements under ERISA.

Both versions of § 1362 impose liability as of the date the plan is terminated, whether that liability is placed on a "contributing sponsor" or an "employer". Although the PBGC says the plans will probably be terminated in June and October of 1990, it has not yet terminated either of them. The debtor has not been a contributing sponsor or an employer of Cornbelt or Cedar Rapids since the sales in 1984, even if debtor and old Wilson are treated as identical entities. Nor will debtor be a contributing sponsor or an employer when the plans are ultimately "terminated." Under a plain meaning interpretation of either version of § 1362, debtor cannot be liable.

*Predecessor Liability*

But, the PBGC urges upon the Court not the plain meaning of the statutes, but the "implied termination" theory created in *In re Consolidated Litigation Concerning International Harvester's Disposition of Wisconsin Steel*, 681 F.Supp. 512 (N.D.Ill. 1988) a decision from the Northern District

---

**3.** The term "employer" is defined in § 1002 of the older version of ERISA to mean "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an

employee benefit plan; and includes a group or association of employers acting for an employer in such capacity."

of Illinois that we will refer to as *"Harvester."*

Under this theory, § 1362 permits the PBGC recovery if the debtor (or old Wilson) sold the Albert Lea and Cedar Rapids assets with subjective intent to evade its pension obligations, and if the buyer's business position, judged objectively, gives it no reasonable chance of paying the assumed pension obligations. According to this theory, a sale transferring pension obligations under these conditions causes an "implied termination" under § 1362 resulting in liability to the seller.

International Harvester ("IH") had a division known as Wisconsin Steel Division, formerly Wisconsin Steel Works. It engaged primarily in the production of steel bars. In the 1970s, it began to incur substantial losses. Its collective bargaining agreements had led to pension obligations that were unfunded.

IH offered to sell the division to as many as 70 different companies over several years. In 1976, IH began negotiating with Envirodyne, a small environmental engineering consulting firm from California. In 1977, a 100 percent leveraged buyout was worked out with this small company, even though "the division's net worth dwarfed that of Envirodyne, and Envirodyne had no experience in any aspect of the steel industry." *Id.* at p. 515. The transaction with Envirodyne concluded with IH loaning the buyer $50 million of the $65 million total sale price, secured by a mortgage. The remaining $15 million came from another loan secured by the division's inventory and accounts receivable. Envirodyne formed a subsidiary to take the assets purchased, and the new company, called WSC, agreed to "take over all the pension obligations of the division." *Id.* at p. 515. However, for the next three years IH continued to control the pension trust fund and did not turn over the fund to WSC until after WSC filed bankruptcy in 1980. WSC's bankruptcy filing was precipitated by IH's foreclosure of its mortgage. Because WSC was insolvent, many creditors, including the PBGC, were seeking to make International Harvester, a solvent company, responsible for their claims.

The PBGC filed a complaint in four counts seeking to state a claim for relief under ERISA § 4062 against IH for the unfunded pension benefits of WSC. Count I alleged IH was a joint employer with WSC. Count II alleged IH was the sole real employer under the Act. Count III charged the sale was a fraudulent transfer. Count IV set out the facts of the sale as grounds for liability and sought to make IH responsible for at least the shortfall on the pension promises through the time of the sale in July of 1977.

On the eve of trial and after six years of discovery, IH filed a motion to dismiss the complaint, ostensibly because it did not state a cause of action.

The court's opinion does not expressly state when termination occurred.[4] But, apparently the ERISA pension plan was "terminated" under § 1348 shortly after WSC filed bankruptcy, about three years after the sale.

The applicable law was the version of § 1362 in effect at the time of the sale in 1977. It simply said: "This section applies to any employer who maintained a single-employer plan at the time it was terminated...." The measure of liability for an "employer" who qualifies is set out in subsection (b) of the statute. It prescribes that the employer shall be liable to the PBGC for unfunded benefits up to 30 percent of its net worth measured on a date within 120 days of termination. Since there was a formal plan termination after the bankruptcy filing, the question, as IH saw it, was whether it could be classified as the "employer" at termination. As the *Harvester* court saw it, the question was whether the PBGC could state a claim for relief against solvent IH because it was attempting to evade its pension responsibilities by transferring unfunded obligations to a buyer lacking the financial and operational know-how to successfully assume those obligations.

**4.** Termination dates are decided under the rules set out at ERISA § 4048, 29 U.S.C. § 1348.

The court denied IH's motion to dismiss, ruling in effect that the PBGC had stated a claim upon which relief could be granted if it could prove IH's evasive conduct. The court noted that with additional facts, the PBGC might be able to show that even after the sale, IH was the real decision-maker in pension matters; that WSC engaged in pension negotiations and made pension contributions as the agent of IH; and that IH and WSC were actually joint venturers in maintaining the pension plans. Under these scenarios, the court thought that IH might be found liable as an employer under § 1362.

*Harvester* discussed at length the meaning of a statutory exception to the 1986 version of § 1362. This statute appears at § 1369 and provides for predecessor liability, but only as to transactions becoming effective on or after, January 1, 1986.[5]

The court ruled that predecessor liability, in some form, existed prior to the enactment of § 1369(a) in 1986 by virtue of § 1362. It noted that the two sections could not be completely reconciled. But, faced with a situation that Congress evidently did not foresee when it enacted ERISA, the court felt it "must search for an interpretation and application which can reasonably fit both the statutory language and congressional intent as expressed in the legislative history, and which can also carry out the statute's purpose." *Id.* at p. 525.

After interpreting the legislative history, the court explained the test it would apply in determining predecessor liability under § 1362. It postulated that predecessor liability under § 1362 would require proof of two elements, one subjective and one objective. The court decreed that liability would arise if the employer's "principal purpose" for the sale was to evade pension liability and if, objectively, the buyer lacked a reasonable chance of meeting those obligations. According to the court, both tests must be met for liability to attach. The following language from *Harvester* illustrates the point:

Take the case of an employer who intends to evade his pension obligations but to whom it is all the same whether the PBGC or his successor picks them up. He sells his business to, and delegates the obligations to, a Fortune 500 company with every likelihood of success in the business. A sale to a viable buyer is not an abuse of the *insurance program*, and would not constitute an implied-in-fact termination under 1362. If, contrary to all expectations, three years later the buyer goes bankrupt and the plan terminates, the predecessor employer would not be liable.

*Id.* at p. 526, 527.

### Harvester Rationale Questioned

The *Harvester* decision is based on the legislative history of two statutes. One of those statutes did not apply because it was expressly limited to transactions effective on or after January 1, 1986. 29 U.S.C. § 1369. On its face, the other statute imposes liability only when the employer maintains the plan at the time of termination. 29 U.S.C. § 1362.

In this Court's view, the most that can be said for the legislative history supporting the version of § 1362 in effect in 1984 is that it expresses Congress' belief that solvent employers should pay their pension promises. Little, if anything, in that history shows that Congress intended the word "employer" in early § 1362 to include a company that had completed the transfer of its plan to an assuming buyer before termination of the plan. At best, the legislative history demonstrates that Congress failed to consider the problem.

But, *Harvester* relied upon the legislative history under the newly enacted § 1369, passed in 1986, to help find a pre–1986 basis for predecessor liability. From that history, the court concluded that, indeed, predecessor liability did exist under the older version of § 1362 and that § 1369 was but an expression of that already viable liability.

While this Court may question the reasoning and conclusion of *Harvester* that

---

**5.** The text of 29 U.S.C. § 1369 appears on pages 863–64.

predecessor liability existed for certain transactions before 1986, it is not necessary in this case to denounce that doctrine.

### No Claim Stated

■ The *Harvester* court set out a two-part test to determine if predecessor liability would be imposed. It provided liability if: (1) an employer, through the sale of his business, delegates his pension obligations to his buyer with the principal purpose of evading pension liability, and (2) if, objectively, his buyer lacks a reasonable chance of meeting those obligations.

In this case, the PBGC attempts to come within this two-part test to impose liability for the debtor's (old Wilson's) sales of facilities in 1984. But, what effort does it make to meet these tests? First, it *alleges* that the debtor entered into favorable co-pack agreements with the new companies. Second, it *alleges* that the debtor exercised leniency in its financial dealings with the buyers. Third, it *alleges* that Cedar Rapids and Cornbelt were under-capitalized at the time of the sales.

Debtor states that it has produced large quantities of documents in response to the PBGC's discovery requests. It further claims that discovery has been ongoing for approximately one year. The PBGC does not deny this. Although the PBGC does not deny that it has had over one year to discover relevant facts, it has neither produced the factual basis for its claim by affidavit, nor produced an affidavit under Rule 56(f) protesting that essential facts are unavailable to it for any reason.

All allegations made by the PBGC are unsupported by affidavit, deposition or exhibit. As set out in the opening portion of this opinion, the PBGC has failed to respond to the debtor's motion for summary judgment with anything more than its opposition brief containing these bare allegations. There are no facts before this Court to identify: (1) the extent of the financial leniency granted by the debtor; (2) the nature, kind, and extent of financial dealings the debtor had with these companies; (3) the degree of favoritism the companies received in regard to the co-pack agreements; or (4) the amount of any undercapitalization of the companies at the time of the sales.

The PBGC makes no showing by affidavit or other document that Cornbelt and Cedar Rapids had no reasonable chance of meeting the obligations they undertook in the sale agreements.

*Harvester* noted that it read the legislative history "to say that Congress had some concern for employers, but only for those facing significant economic hardship; otherwise, a solvent employer was expected to bear the cost of the pension he had promised." *Id.* at p. 524. The concern of Congress was that solvent sellers should not foist their unfulfilled promises on the insurance fund by means of a transfer to a less able payor. When an insolvent seller is being considered for pension evasion liability, the legislative history implies that Congress might consider the whole issue in a different light.

The facts of the *Harvester* case appear to be quite egregious. The sale was by a solvent company. The deal was 100 percent leveraged, with the seller secured on over 80 percent of the debt. The buyer was weak financially. The buyer had no experience in any aspect of the business it purchased. The seller retained control of the plan fund for three years after the sale. This exercise of control, coupled with the dominance of IH's mortgage, provided the possibility that evidence might prove IH was controlling WSC after the sale as an actual employer.

In contrast, old Wilson was in Chapter 11 bankruptcy at the time of the first sale and had just confirmed a plan at the time of the second. Certainly old Wilson can be contrasted with IH on the solvency question. Most companies in Chapter 11 are there because they cannot pay their debts as they come due, and this is often accompanied by balance sheet insolvency.

The PBGC developed no facts upon which to judge whether the principal purpose of the sales was to evade liability as contrasted with other business reasons old Wilson may have had for its actions. A

company in Chapter 11 must obtain court approval before completing a sale out of the ordinary course of business, which these sales surely were. 11 U.S.C. § 363(b). The PBGC offers nothing to show whether this approval was obtained or whether the Oklahoma court record suggests evasive intent as opposed to legitimate business purpose. While the second sale apparently took place after confirmation of old Wilson's Chapter 11 plan so that no prior court approval would have been required, it seems probable that the immediacy of this sale would have been known to those voting on the plan. Yet, the PBGC advances nothing to show why this sale was made or whether it was done to avoid pension debt rather than for some less sinister motive.

The PBGC establishes no facts questioning the financial position or industrial expertise of the buyers on the dates of sale. All the PBGC does is *allege* under-capitalization, which is far from lacking a reasonable chance to pay the assumed debt, even if the shortage of capital is proven. The buyer's borrowing prospects at the time of the purchases would also seem relevant, as would many other factors besides capitalization. Yet, the PBGC leaves the Court with nothing to hang on this prong of the test advanced in *Harvester.*

The record before the court does not establish that there are material issues of fact for determination. Debtor has put forth facts by affidavit and related documents with it motion. The PBGC has failed to contravene by affidavit or otherwise the facts put forth in debtor's motion. The record shows that old Wilson sold assets and transferred unfunded pension plans to the buyer in 1984, but there is no showing that old Wilson made the sales with intent to evade its pension obligation or that the buyers at the sales were so financially deprived as not to have a reasonable chance to pay the obligations they assumed in the sales contracts. On this state of the record, the Court finds that the PBGC has not met the requirements of the *Harvester* two-pronged test of seller's in-

tent to evade and buyer's lack of a reasonable chance to pay the assumed pension debts. The facts do not fulfill either of the two tests of liability. Consequently, the PBGC has failed to allege facts sufficient to state a claim under ERISA § 4062, 29 U.S.C. § 1362 upon which relief can be granted against the debtor.

### III.

#### *Transactions Under § 1369*

By its express terms, § 1369(a) applies only to transactions which occurred after January 1, 1986.[6] The PBGC contends that the debtor (actually old Wilson) made renewal and extensions of credit and other contracts with the buyers after the sales of the companies in 1984 and after January 1, 1986, the effective date of § 1369. These transactions, the PBGC says, were done to keep the companies alive for a minimum of five years after 1986 to avoid liability under § 1369. The PBGC characterizes these as "transactions to evade liability" within the meaning of § 1369 and charges that many of the "transactions" have taken place within five years of the proposed termination dates of the plans. Therefore, the PBGC argues that liability may also arise from these transactions under § 1369(a).

The term "transactions" is not defined by ERISA. The PBGC cites no authority for its position that renewal or extensions of credit or entering into contracts with another party amounts to a "transaction" within the meaning of § 1369.

The Court finds that these transactions allegedly completed by the debtor after the sale of the companies and after January 1, 1986, are not "transactions to evade liability" within the meaning of § 1369(a). A "transaction to evade liability" contemplates a transfer of responsibility for meeting the funding requirements of ERISA. The transactions to which the PBGC refers are simple commercial events without which normal business could not survive. If the Court were to adopt the PBGC's definition of "transaction," the five-year

---

6. The text of 29 U.S.C. § 1369 appears on pages 863–64.

limitation would be rendered practically meaningless whenever the seller of an ERISA plan business makes a continuing contract with the buyer. As a matter of policy, it would be impractical to place this type of potential liability on every business sale associated with an unfunded pension liability at the time of sale. The seller would be unable to finance the buyer without running the risk that at some point in the future, a PBGC claim for unfunded liability would arise. Every extension or renewal of credit or business contract would extend the duration of potential liability if this were the rule.

The PBGC also contends that the debtor (or old Wilson) did these extensions and renewal of credit and other contract deals in a deliberate attempt to keep the buyer companies alive for five years, believing that it could thereby evade pension benefit liability. This is contrary to common sense. Prior to the 1988 *Harvester* case, there are no reported cases cited by either party on the subject of this precise kind of predecessor liability. With the enactment of § 1369, a contributing sponsor that sold its business on or after January 1, 1986, with the principal purpose of evading pension benefit liability, became subject to a claim by the PBGC. However, the companies in this case were sold in 1984 and the only published decision discussing this kind of predecessor liability for transactions occurring prior to 1986 was issued in March of 1988, *i.e., Harvester.*

Accordingly, the Court finds no merit to the PBGC's claims against the debtor based on liability under § 1369(a).

## IV.

### *Discharge and § 502(e)*

The Court will not rule on the two remaining arguments raised by the debtor in its motion for summary judgment.

Insufficient information is provided upon which to base a ruling on the discharge issue. The extent of the discharge received by the debtor in its 1984 bankruptcy may depend on the terms of the reorganization plan and the order confirming plan in that case. 11 U.S.C. § 1141(d)(1). Debtor has not furnished the Court with these documents. Without them, the Court could not properly rule on this part of the debtor's motion for summary judgment.

Bankruptcy Code § 502(e) is inextricably tied to § 509. The debtor's arguments fail to address the effect of this related Code section. Additional arguments and authorities would be needed before the Court could rule on this issue raised in the debtor's motion for summary judgment.

### *Conclusion*

There being no adequate basis in the record by affidavit or otherwise upon which to find a genuine issue as to any material fact, and based upon the facts as presented by the moving party, the Court determines that the PBGC fails to state a claim under ERISA, 29 U.S.C. § 1362 or § 1369 upon which relief can be granted against debtor. Accordingly, the Court grants the debtor's motion for summary judgment and rules that since the PBGC's claims are unenforceable under ERISA, 29 U.S.C. § 1362 and ERISA, 29 U.S.C. § 1369, they are not allowable claims against the debtor's estate under 11 U.S.C. § 502(c)(1).

The debtor's motion for partial summary judgment filed January 11, 1991, raised issues of priority, lien status, and administrative expense status of the PBGC's proofs of claim. This motion was argued and submitted for decision on March 7, 1991. That motion and this decision covered the identical proofs of claim filed by the PBGC. Because those claims are disallowed, the prior motion is moot and the court will not decide that motion.