In re TENNESSEE CHEMICAL
COMPANY, Debtor.

Scott N. BROWN, Jr., Trustee
in Bankruptcy, Plaintiff,

v.

SHELL CANADA, LTD., Defendant.

Bankruptcy No. 1–89–01106.
Adv. No. 90–1087.

United States Bankruptcy Court,
E.D. Tennessee.

Aug. 4, 1992.

See also 122 B.R. 984.

David B. Kesler of Brown, Dobson, Burnette & Kesler, Chattanooga, Tenn., for plaintiff.

Richard B. Gossett & Stacy B. Divine of Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Chattanooga, Tenn., for defendant.

## MEMORANDUM

RALPH H. KELLEY, Chief Judge.

Shortly before filing a Chapter 11 bankruptcy case, Tennessee Chemical secured a

debt to Shell Canada by giving it a security interest in Tennessee Chemical's property. The bankruptcy trustee for Tennessee Chemical alleges that the transfer of the security interest can be avoided as a preferential transfer. 11 *U.S.C.A.* § 547 (West 1979 & Supp.1992).

The trustee can avoid the transfer as a preference only if Tennessee Chemical was insolvent at the time of the transfer. 11 *U.S.C.A.* § 547(b)(3) (West 1979). The question now before the court is whether Tennessee Chemical was insolvent at the time of the transfer.

The court assumes that the transfer of the security interest occurred on March 13, 1989, when Shell Canada filed a financing statement to perfect the security interest. *Tenn.Code Ann.* § 47–9–301 (1991); 11 *U.S.C.A.* § 547(e) (West 1979 & Supp.1992). Tennessee Chemical filed its Chapter 11 case less than a month later, on April 10, 1989.

The preference statute creates a presumption that the debtor was insolvent during the 90 days before bankruptcy. 11 *U.S.C.A.* § 547(f) (West 1979). Since the transfer occurred in the 90 days, the trustee is entitled to the presumption.

Shell Canada relied on two exhibits to rebut the presumption of insolvency—Tennessee Chemical's bankruptcy schedules and an operating report that Tennessee Chemical filed with the United States Trustee. Both exhibits were admitted without objection. The first question is whether these exhibits rebutted the presumption of insolvency.

■ The schedules show property worth about $45,300,000 and debts totalling about $41,200,000. There are two clear mistakes in the schedules. The debt total does not include a debt of about $590,000. The schedules also do not give any value to the AES stock even though the trustee has been offered $1,750,000. With these corrections, the schedules still show solvency.[1]

The schedules value the land, buildings, chemical equipment, other equipment, and construction in progress at $25,600,000. This amount is cost less depreciation as shown on Tennessee Chemical's books. Most of this amount is attributable to the chemical equipment, which was valued at almost $20,000,000.

Shell Canada has an argument that the values in the schedules must be treated as market value because the schedules are supposed to give market value. *Fed. R.Bankr.Proc.* 1007 & Official Bankruptcy Form 6 (Clark–Boardman–Callaghan Norton Bankr. Rules Pamph. 1991–92). The court does not agree. The property schedule may represent the values to be market values, but they are still cost less depreciation.

The report to the U.S. Trustee for April, 1989 follows the same pattern. The report uses cost less depreciation as the value of the same property, and its value makes up more than one-half the total value shown in the report.

In summary, more than one-half the total property value shown in the bankruptcy schedules and in the report to the U.S. Trustee is cost less depreciation on the land, buildings, chemical equipment, other equipment, and construction in progress.

Whether the debtor was solvent or insolvent under the bankruptcy definition depends on the fair value of the debtor's property. 11 *U.S.C.A.* § 101(32) (West Supp.1992).

■ Cost less depreciation may be the correct book value under generally accepted accounting principles, but it is not necessarily close to the fair value. The original cost of the property was derived from appraisals that Tennessee Chemical had done when it bought the business in 1982 or 1983. This does not make the cost less depreciation in April, 1989 any more likely to be fair value at that time. Market value minus depreciation for five to six years does not automatically equal market value or any other measure of fair value.

As a result, the schedules and the report to the U.S. Trustee are not good evidence

---

**1.** The schedules do not list as debts the redemption price of the redeemable preferred stock or the accrued dividends, but this may be correct for bankruptcy purposes, as explained later.

of the fair value of Tennessee Chemical's property in April, 1989. The schedules and the report cannot prove solvency under the bankruptcy definition of insolvency. *Sleepy Valley, Inc. v. Leisure Valley, Inc. (In re Sleepy Valley, Inc.),* 93 B.R. 925 (Bankr.W.D.Tex.1988); *Duvoisin v. Anderson (In re Southern Industrial Banking Corp.),* 71 B.R. 351 (Bankr. E.D.Tenn.1987); *American Insulator Co. v. Marsh Plastics, Inc. (In re American Insulator Co.),* 60 B.R. 752 (Bankr.E.D.Pa. 1986); *DeRosa v. Buildex, Inc. (In re F & S Central Mfg. Corp.),* 53 B.R. 842, 13 Bankr.Ct.Dec. 823 (Bankr.E.D.N.Y.1985).

 Shell Canada has an argument that the schedules and the report rebut the presumption of insolvency even though they cannot prove solvency. The argument goes like this.

The accounting firm of Deloitte, Haskins and Sells issued an audited financial statement for Tennessee Chemical as of December 31, 1988. The auditors concluded that the financial statement correctly showed Tennessee Chemical's financial position in accordance with generally accepted accounting principles.

The trustee's expert witness was Mr. Ralph Reese, a certified public accountant with many years' experience. He did not seriously dispute that Tennessee Chemical's books were kept according to generally accepted accounting principles or that the audit was done according to those principles and generally accepted auditing standards.

Since the amounts in the schedules were taken from the books, the schedules are accurate—except for the two errors already mentioned. With those errors corrected, the schedules still show solvency. The schedules are reliable, credible evidence that Tennessee Chemical was solvent.

 The trustee can prevent this evidence from rebutting the presumption by showing that the property was overvalued. But the trustee can do this only with simple, straightforward evidence of lower property values. If the evidence of value

is more complex, it goes beyond trying to save the presumption and gets into the basic question of solvency or not. *Compare Pembroke Development Corp. v. A.P.L. Window (In re Pembroke Development Corp.),* 122 B.R. 610 (Bankr.S.D.Fla. 1991), and *Bluegrass Ford–Mercury, Inc. v. Farmers National Bank (In re Bluegrass Ford–Mercury, Inc.),* 942 F.2d 381 (6th Cir.1991); *Carlson v. Rose (In re Rose),* 86 B.R. 193 (Bankr.W.D.Mo.1988); *W.L. Mead, Inc. v. Central States Pension Fund (In re W.L. Mead, Inc.),* 70 B.R. 651 (Bankr.N.D.Ohio 1986). *See also Akers v. Koubourlis (In re Koubourlis),* 869 F.2d 1319, 19 Bankr.Ct.Dec. 367 (9th Cir.1989); *Kreis v. Shope (In re Ressler),* 61 B.R. 403 (Bankr.E.D.Tenn.1986).

 The trustee's evidence of lower property values was not simple or straightforward. He sold the manufacturing property for much less than the value in the schedules, but the sale took place a year after the transfer to Shell Canada and eleven months into Tennessee Chemical's Chapter 11 case. The sale price can be good evidence of the property's value a year earlier only with additional evidence that events during the year did not cause the large drop in value. This kind of proof goes beyond trying to save the presumption; it goes to the basic question of solvency or insolvency. Thus, the schedules must have rebutted the presumption.

Under this reasoning, the schedules probably rebutted the presumption of insolvency, but the court need not decide at this point. The trustee also tried to prove insolvency. If the trustee proved insolvency, it makes no difference whether the schedules rebutted the presumption. The court assumes that Shell Canada rebutted the presumption and turns to the question of whether the trustee proved that Tennessee Chemical was insolvent in March, 1989.

 Once the presumption of insolvency has been rebutted, the trustee must prove insolvency as if the presumption never existed. *See Bratton v. Yoder Co. (In re Yoder Co.),* 758 F.2d 1114 (6th Cir.1985); *Raslavich v. Elkins (In re Old World*

*Cone Co.),* 119 B.R. 473, 24 Collier Bankr. Cas.2d 198 (Bankr.E.D.Pa.1990).

The court has already pointed out that the schedules and the report to the U.S. Trustee do not prove solvency, but this does not mean the trustee wins. Shell Canada is not required to prove solvency. The trustee must prove insolvency.

The audited financial statement shows Tennessee Chemical as solvent on December 31, 1988 by about $1,600,000, but the court must make some adjustments to the amounts. The court begins with adjustments to liabilities.

■ Mr. Reese, the trustee's expert witness, is not only a certified public accountant but also has much accounting experience in bankruptcy cases. He testified that the deferred income and the deferred income tax were correctly shown as liabilities in the financial statement. However, he did not count them as debts because they would never have resulted in Tennessee Chemical having to pay out any money. The court agrees that they should not be counted as debts under the bankruptcy definition of insolvency. *Sierra Steel, Inc. v. Totten Tubes, Inc. (In re Sierra Steel, Inc.),* 96 B.R. 275, 19 Bankr.Ct.Dec. 269 (Bankr. 9th Cir.1989); *Sleepy Valley, Inc. v. Leisure Valley, Inc. (In re Sleepy Valley, Inc.),* 93 B.R. 925 (Bankr.W.D.Tex. 1988). This reduces debts by about $3,250,-000.

■ Mr. Reese included the redemption price of the redeemable preferred stock as a debt. The stock provided for mandatory redemption. It required the payment of dividends and provided for dividends or interest on unpaid dividends. This made the redemption price look like a debt with the dividends as interest on the debt.

The accountants who did the audited financial statement reached the same or a similar conclusion. They put the redemption price as a liability or something between a liability and stockholders' equity. They put the accrued dividends as a liability.

The trustee, however, did not attempt to prove the effect of state law on the stock-holders' right to payment or Tennessee Chemical's right to make the payments if it was insolvent. The court will not count the redemption price as a debt. Likewise, the court will not count the accrued dividends as a debt. *Joshua Slocum, Ltd. v. Boyle (In re Joshua Slocum, Ltd.),* 103 B.R. 610 (Bankr.E.D.Pa.1989) *aff'd* 121 B.R. 442 (E.D.Pa.1989). This reduces the debts by about $6,000,000 more.

■ These adjustments reduce the total debts on the financial statement by about $9,250,000. However, the court must make a major addition to the debts for unfunded pension liability.

Tennessee Chemical had two defined-benefit pension plans. Tennessee Chemical did not have enough money in the plans to fund all the benefits that were likely to accrue in the future. The accounting standard for defined benefit pension plans allows the total unfunded liability to be amortized over a number of years. As a result, the balance sheet showed the pension debt as only $6,300,000.

This accounting method assumes that the business will continue and can make payments from future income; the going concern assumption is fundamental to business accounting. Leroy F. Imdieke & Ralph E. Smith, *Financial Accounting* 40–41 (1987).

The trustee's expert witness agreed with this method of accounting but only in light of note 7 to the financial statement. He pointed out that note 7 was required by generally accepted accounting principles and that the notes are a crucial part of any financial statement.

Note 7 states the total pension debt as of September 30, 1988, because September 30 was the anniversary date of the plans. The note gives two amounts. It gives $18,200,-000 as the present value of the total debt and $16,900,000 as the projected benefit obligation minus the plan assets at fair value.

The bankruptcy definition of insolvency assumes that Tennessee Chemical would sell all its property at a fair value and use the cash to pay its creditors. If Tennessee Chemical had sold all its property at fair

value in March, 1989, the sale would not have automatically released it from the total pension debt. *See In re Doskocil Companies, Inc.*, 130 B.R. 858, 24 Collier Bankr.Cas.2d 557 (Bankr.D.Kan.1991).

The total pension debt also comes within the Bankruptcy Code's definition of debt. 11 *U.S.C.A.* § 101(5), (12) (West Supp.1992); *Fryman v. Sim Textile Co. (In re Art Shirt Ltd., Inc.)*, 68 B.R. 316 (Bankr. E.D.Pa.1986) *aff'd* 93 B.R. 333 (E.D.Pa. 1988).

The court concludes that the total pension liability should be counted as a debt in determining whether Tennessee Chemical was solvent.

The total pension debt at the end of 1988, instead of September 30, 1988, may have been smaller, but it probably would not have been much smaller. For the purpose of argument, the court will use the smaller amount, $16,900,000 as the total pension debt. This adds $10,600,000 to the debts.

The court has reduced the debts by $9,250,000 and added $10,600,000. With these adjustments, the financial statement shows that Tennessee Chemical was solvent by about $250,000.

Now the court must make some adjustments to Tennessee Chemical's property as shown in the financial statement. The adjustments involve fair valuation as required by the bankruptcy definition of insolvency.

A forced sale price is not fair value, and neither is the price the debtor might obtain over a long period of time. "The general idea of fair value is the amount of money the debtor could raise from its property in a short period of time, but not so short as to approximate a forced sale, if the debtor operated as a reasonably prudent businessman with his interests in mind, especially a proper concern for the payment of his debts." *Jahn v. Reading Body Works (In re A. Fassnacht & Sons, Inc.)*, 45 B.R. 209, 217 (Bankr.E.D.Tenn.1984).

The court begins with the AES stock. The financial statement does not include the AES stock. The trustee had an appraisal done; the stock appraised for $5,000,000 to $8,000,000. The appraiser did not testify.

The trustee testified that the stock is a valuable but not liquid asset. AES's one asset is a limited partnership interest in NFS, Ltd. NFS, Ltd., owns the stock of Nuclear Fuel Services, Inc., and some promissory notes owed by Nuclear Fuel Services, Inc. AES's limited partnership interest amounts to a 16% interest in the stock of Nuclear Fuel Services, Inc., and a 20% interest in the promissory notes. Nuclear Fuel Services is a profitable business, but it has not declared a stock dividend for quite a while. The notes pay quarterly interest; the last payment was about $41,-000. The only potential buyers who have shown much interest in the stock are the other limited partners or stockholders. The trustee had an offer from them of $1,750,000. He turned down the offer because it was too much below the appraised value. He had not negotiated the offer for at least six months before the trial.

Under the fair valuation standard, the court must consider what the stock could have been sold for in a reasonably short period of time. The value of an asset must be reduced when there is no current market for it. *Sleepy Valley, Inc. v. Leisure Valley, Inc. (In re Sleepy Valley, Inc.)*, 93 B.R. 925 (Bankr.W.D.Tex.1988). In light of the trustee's testimony, the court might be justified in valuing the stock at zero. However, the trustee did have an offer of $1,750,000.

The trustee's testimony also supports the conclusion that the stock's value has changed very little since the 90 days before Tennessee Chemical's bankruptcy. The court will add $1,750,000 to Tennessee Chemical's assets as the value of the AES stock.

With these adjustments to property and the previous adjustments to debts, the financial statement shows that Tennessee Chemical was solvent by about $2,000,000.

Next comes the most difficult question. What was the value of Tennessee Chemical's manufacturing property at the time of the transfer to Shell Canada?

Going concern valuation seems to be the correct method for valuing the manufacturing property in March, 1989. The court bases this conclusion on detailed evidence that appears later in this opinion but can be summarized now. The business was not making a profit in early 1989 and had not made a profit in 1987 or 1988. Nevertheless, the business was not in such bad shape that it could not be sold as a going concern. Indeed, it was sold as a going concern after another year of poor performance during its Chapter 11 case. *Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.)*, 56 B.R. 339, 13 Bankr.Ct.Dec. 1172 (Bankr.D.Minn.1985) *aff'd* 850 F.2d 1275, 20 Collier Bankr.Cas.2d 19 (8th Cir.1988).

The court is making the usual assumption that going concern value is greater than forced sale, liquidation, or salvage value. Going concern value means that value is added to the property because it can be operated as a business. However, Tennessee Chemical's going concern value may not have been much more than its liquidation value, as explained below.

The court has already pointed out a basic rule of accounting—the assumption that the business will continue. When the auditors have good reasons to doubt a business's ability to continue, they must note it in the financial statement. *Copy–Data Systems, Inc. v. Toshiba America, Inc.*, 755 F.2d 293, 299, note 2 (7th Cir.1985) *cert. den.* 474 U.S. 825, 106 S.Ct. 80, 88 L.Ed.2d 66 (1985).

Note 1 to the financial statement qualified the going concern assumption for Tennessee Chemical. The note pointed out that the business had net operating losses in 1987 and 1988, its current debts were more than its current assets, and it had defaulted on its bank borrowings. The note finished by saying:

Continued operation ... is dependent on the Company's ability to generate sufficient cash flow to meet its obligations on a timely basis, to comply with the terms and covenants of its financing agreement, to obtain additional financing or refinancing as may be required, and ulti-

mately to attain successful operations. Management is continuing its efforts to generate sufficient cash flow to meet its obligations and sustain operations from various sources.

The last paragraph of the auditors' introductory letter also included this warning:

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 ... the Company's recurring losses from operations raise substantial doubt about its ability to continue as a going concern. Management's plans concerning these matters are also described in Note 1. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

Shell Canada introduced as an exhibit a financial forecast that was dated March 27, 1989. Tennessee Chemical's management had the forecast done as part of an attempt to sell the business to the employees under an employee stock ownership plan. The forecast was not an audit under accounting standards and did not meet the lower standard of a review. In accounting terms, it was a compilation. The court has no reason to doubt the accuracy of the information as to Tennessee Chemical's past operations. The question is what do the predictions mean to going concern value.

The forecast showed Tennessee Chemical making a fast turnaround. It predicted that the operating loss for 1989 would be one-fifth to one-sixth of the losses in 1987 and 1988, and that the business would make a profit in 1990. This turnaround was based largely on concessions from the employees that would reduce costs. The accountants also used a number of other assumptions about percentage increases and decreases in costs and sales. These assumptions apparently were furnished by the management.

Considering the purpose of the forecast and how it was formulated, the court doubts the accuracy of its predictions. In any event, it was only a prediction based on events that might or might not happen. It

does not detract from the court's conclusion that Tennessee Chemical's going concern value may not have been much more than its liquidation value in early 1989.

■ Going concern value applies only to the property needed to operate the business. Tennessee Chemical had other property, but the financial statement and the schedules valued the manufacturing property at about one-half of the total. This makes its value most important to the total value of Tennessee Chemical's property.

When the court refers to the book value of the chemical equipment, the court means the original cost minus accumulated depreciation. The financial statement does not give the exact book value of the chemical equipment at the end of 1988. The bankruptcy schedules give the book value as almost $20,000,000 on April 10, 1989. The court can assume that the book value on December 31, 1988, was more because less depreciation had been deducted.

■ In March, 1990, the bankruptcy trustee and Boliden Company entered into a sale contract. The contract provided for Boliden to operate the business under a management contract first. Boliden took over and operated the business beginning in March, 1990, and completed the purchase in September 1990.

The sale price was basically set in March, 1990. The contract originally provided that Boliden would pay a percentage of profits for three years after the sale. The trustee testified that neither side was especially excited about this provision. He and Boliden agreed to take it out in return for a slight addition to the cash purchase price, but this was not a major change to the price.

Boliden paid the cost value of the inventory after an audit. It paid the book value of accounts receivable less a reserve for accounts not likely to be collected. For the chemical manufacturing property—the buildings and equipment—Boliden paid $500,000.

Shell Canada objected to the trustee's testimony on the ground that it was not relevant. Shell argues that the sale price of the manufacturing property in March, 1990 cannot be relevant to its value in March, 1989.

The court does not agree. The value of the manufacturing property may have changed during the year before the sale. But this does not prevent the sale price from being evidence of the value one year earlier. It only means that the court must consider events during the year to determine whether the sale price is good evidence of the property's value at the year's beginning. *See, e.g., Pittman v. Union Planters Nat'l Bank & Trust Co. (In re National Cottonseed Products Corp.),* 118 F.2d 211 (6th Cir.1941) *cert. den.* 314 U.S. 632, 62 S.Ct. 65, 86 L.Ed. 507 (1941); *Bluegrass Ford–Mercury, Inc. v. Farmers National Bank (In re Bluegrass Ford–Mercury, Inc.),* 942 F.2d 381 (6th Cir.1991); *Kreis v. Shope (In re Ressler),* 61 B.R. 403 (Bankr.E.D.Tenn.1986).

Though it may seem odd, the trustee has an advantage on this point because of the huge difference between the book value in March, 1989 and the sale price a year later. In March, 1989 the book value of the chemical equipment by itself was $20,000,000, but the equipment and the buildings sold for only $500,000 a year later. If events during the year do not explain such a big drop in value, the court can infer that the fair value of the chemical equipment in March, 1989 was much less than the $20,-000,000 book value.

Tennessee Chemical was in Chapter 11 bankruptcy for eleven months of the year between the transfer to Shell Canada and the sale to Boliden. During that time Tennessee Chemical continued to use the equipment to manufacture chemicals. At the end of the year, the trustee sold the equipment to Boliden and it continued to use the equipment to manufacture chemicals.

These bare facts suggest that nothing occurred to cause a huge decrease in the value of the chemical plant and equipment during the year. However, the court will look more closely at changes during the year.

The audited financial statement was supposed to show Tennessee Chemical's financial position on December 31, 1988. However, the auditors' introductory letter was dated March 21, 1989. Mr. Reese testified that March 21, 1989 should have been the last day of field work on the audit. If the accountants learned of a material financial change between December 31, 1988, and the date of the letter, they were supposed to note it in the financial statement. The financial statement does not mention any material change in that time.

The court was not presented with any other evidence of major changes in the business between December 31, 1988 and Tennessee Chemical's bankruptcy filing on April 10, 1989.

The court looks next at the changes that occurred after the bankruptcy filing on April 10, 1989 and before the trustee's sale of the manufacturing property in March, 1990. The evidence of changes comes mostly from the exhibits, but they require some background explanation.

In 1987 Tennessee Chemical closed its mining operation. In December, 1988 Tennessee Chemical sold several chemical plants, known as the satellite business. When Tennessee Chemical filed its bankruptcy in April, 1989, its business did not include the mining operation or the satellite business. Tennessee Chemical's remaining business had two parts. It sold chemicals that it manufactured at its plant in Copperhill, Tennessee, and it sold chemicals manufactured by other companies.

These changes could make it impossible to compare the business's performance in 1989 with earlier years. However, the financial forecast cures the problem.

The forecast attempts to predict Tennessee Chemical's future business in light of changes proposed by management. In order to make a valid comparison with earlier years, the forecast shows the past performance of only those parts of the business that remained in 1989. It does not include the past performance of the satellite business and the mining operation.

■ The court will focus on whether the business had operating gains or losses. For this purpose, the court will use the amount identified as earnings or income before interest, taxes, and extraordinary expenses. (Note 1 to the audited financial statement refers to this amount as the operating loss for 1987 and 1988.)

In the report to the U.S. Trustee the figure is given as income before interest, taxes, extraordinary expenses, and depreciation. However, depreciation is given separately so that it can be subtracted to give the operating gain or loss.

■ The bankruptcy schedules and the forecast give different amounts for January and February, 1989. The bankruptcy schedules show a combined operating loss of $415,000, compared to $564,000 shown by the forecast. The court will use both amounts.

The court has not found any reliable figures for March, 1989. The amounts in the financial forecast appear to be predictions since the forecast was issued before the end of March. As a result, the court's calculations for 1989 are based on eleven months—January, February, and April through December.

The report to the U.S. Trustee shows a total operating loss of $2,882,000 for April through December, 1989. The following table compares the monthly operating losses for 1987, 1988, and 1989.

| | 1987 | 1988 | 1989 |
|---|---|---|---|
| Average Monthly Operating Loss | 441,000 | 525,000 | 300,000 – 313,000 |

The next table is derived from the financial forecast, the report to the U.S. Trustee, and the bankruptcy schedules. It shows the monthly averages for revenue and cost of revenue during the same time periods.

| Monthly Averages | 1987 | 1988 | 1/1989 & 2/1989 | 4/1989 – 12/1989 |
|---|---|---|---|---|
| Revenues | 8,890,000 | 9,230,000 | 10,120,000 – 10,200,000 | 5,500,000 |
| Cost of Revenues | 8,920,000 | 9,320,000 | 9,980,000 – 10,060,000 | 5,271,000 |

The report to the U.S. Trustee shows a fall-off in total accounts receivable toward the end of 1989. The report also shows that accounts receivable were getting older during the bankruptcy case. Mr. Reese testified that one $200,000 account receivable became uncollectible, but this does not explain the overall aging of the accounts receivable. The aging could have resulted partly from Tennessee Chemical's bankruptcy, but no witness gave this explanation or any other explanation.

Finally, the report to the U.S. Trustee shows that the cost of the bankruptcy case was mounting. The report is not clear, but it apparently means expenses that were not incurred in operating the business—expenses such as lawyers' fees and the U.S. Trustee fees.

The trustee testified that when he was appointed in late February, 1990 the business was *in extremis.* He was appointed to sell the business. Three offers were on the table. He determined that one offer was not likely to be carried out. PBS Chemical had offered to buy some of the assets, but it did not intend to operate the plant. This offer was put on hold to see if the trustee could sell the plant to Boliden. Less than a month after his appointment, the trustee made the deal with Boliden. The business was still operating when the trustee struck the deal with Boliden, and Boliden continued to operate it.

What do these facts show? In early 1989 the business was losing money and was likely to continue losing money. It filed a Chapter 11 case in April, 1989. After filing Chapter 11 the business went downhill but not rapidly. It continued losing money. It lost money at a lower rate, but this was because the business shrank during the Chapter 11 case.

■ The court will assume that the Chapter 11 itself caused a drop in the value of the business. Likewise, the continued operating losses probably caused a drop in the value of the business. You can add the mounting bankruptcy costs as a reason for a drop in the value of the business. Potential buyers were likely to think that the bankruptcy trustee had to sell the business or shut it down. In light of these facts, the trustee's sale price for the manufacturing property may have been close to liquidation or forced sale value.

On the other hand, the court cannot believe that events from March, 1989 to March, 1990, caused the value of the chemical equipment to drop from $20,000,000 to $500,000. The court has already pointed out that the business probably had very little going concern value at the end of 1988. The events from then until the sale in March, 1990 do not not support such a gigantic drop in the value of the chemical equipment or the other manufacturing property. *Compare Pittman v. Union Planters Nat'l Bank & Trust Co. (In re National Cottonseed Products Corp.),* 118 F.2d 211 (6th Cir.1941) *cert. den.* 314 U.S. 632, 62 S.Ct. 65, 86 L.Ed. 507 (1941).

■ The court concludes that the value of the chemical equipment in March, 1989 was nowhere near the book value of almost $20,000,000.

The court's earlier adjustments to the financial statement showed Tennessee Chemical to be solvent at the end of 1988, but only by about $2,000,000, and that depended on the manufacturing equipment having a value of around $20,000,000.

For the court to conclude that Tennessee Chemical was actually insolvent at the end of 1988, the court need not subtract any specific amount from the book value of the manufacturing property as shown in the financial statement. Exactness is not required in determining solvency or insolvency. *Exchange National Bank v. Curtis (In re Shelley Furniture, Inc.)*, 283 F.2d 540 (7th Cir.1960). The court concludes that Tennessee Chemical was vastly insolvent at the end of 1988 because the chemical equipment had a value closer to $500,-000 than to $20,000,000.

The bankruptcy schedules support the same result after adjustments.

| | |
|---|---|
| Assets shown by schedules | $45,288,000 |
| Prepaid expenses & deposits | + 355,000 |
| AES Stock | + 1,750,000 |
| **TOTAL ASSETS** | **$47,393,000** |
| | |
| Debts shown by schedules | $41,212,000 |
| Pension debt | + 2,900,000 |
| Vacation pay accidentally omitted from total | + 592,000 |
| **TOTAL DEBTS** | **$44,704,000** |

With these adjustments, the schedules show Tennessee Chemical to have been solvent by about $2,700,000. But the asset total is based on the chemical equipment having a value of almost $20,000,000. The court has decided that its value was nowhere near that amount.

The financial forecast suffers from the same problem as the schedules, the financial statement, and the report to the U.S. Trustee. The forecast values the manufacturing property at cost less depreciation, and its value makes up about one-half of the company's total value. As a result, the financial forecast does not do any better job of proving solvency.

■ Thus, the evidence shows that Tennessee Chemical was vastly insolvent on December 31, 1988 and on April 10, 1989. The transfer to Shell Canada occurred on March 13, 1989. In this situation the court does not need evidence that Tennessee Chemical's financial condition was the same from the end of 1988 to March 13, 1989, or from April 10, 1989 back to March 13. The court can assume that Tennessee Chemical did not suddenly and miraculously become solvent on March 13, 1989.

■ Under cross-examination, the trustee's expert witness admitted that he did not include the value of leasehold or contract rights as property or the corresponding liabilities as debts. However, a defendant cannot overcome the trustee's proof of insolvency with the suggestion that some property of some unknown value may have been left out. This is especially true when the property's value might have been decreased by debts associated with it.

■ Finally, the court must deal with the problem of hearsay evidence. The trustee's expert witness devalued the property based partly on the prior testimony of Tennessee Chemical's president, who did not testify. The trustee had the pension plans audited to determine the total pension debt, but the auditor did not testify. The trustee had a consultant determine the amount of environmental debts owed by Tennessee Chemical, but the consultant did not testify.

All of this evidence appears to be inadmissible hearsay or based on inadmissible hearsay. The trustee attempted to qualify the environmental liability report under the business records exception to the hearsay rule, but it does not seem to fit the exception. *Fed.R.Bankr.Proc.* 9017 & *Fed. R.Evid.* 801–803 (Clark–Boardman–Callaghan Norton Bankr. Rules Pamph. 1991–92); Hon. Barry Russell, *Bankruptcy Evidence Manual* §§ 801.1, 802.1, 803.11–18 (West 1991); *see also Clay v. Traders Bank (In re Briarbrook Development Corp.)*, 11 B.R. 515, 4 Collier Bankr.Cas.2d 871 (Bankr W.D.Mo.1981) *rev'd on other grounds* 708 F.2d 1347, 10 Bankr.Ct.Dec. 1317 (8th Cir.1983). As a result, the court has not relied on any of this evidence.

The court mentioned the appraisal of the AES stock. The court assumes that the appraisal was inadmissible hearsay, but in

the circumstances it made no difference; the appraisal was favorable to Shell Canada, and the court decided on a different value.

The court will enter an order finding that Tennessee Chemical was insolvent at the time of the transfer to Shell Canada.

This memorandum is the court's findings of fact and conclusions of law. *Fed. R.Bankr.Proc.* 7052 (Clark–Boardman–Callaghan Norton Bankr. Rules Pamph. 1991–92).